BOIES SCHILLER FLEXNER LLP
ALISON L. ANDERSON (SBN 275334)
*alanderson@bsfllp.com*
725 S Figueroa St, 31st Floor
Los Angeles, CA 90017
Tel: (213) 995-5720/ Fax: (213) 629-9022

SIGRID S. MCCAWLEY
*smccawley@bsfllp.com*
ALISHA MORICEAU
*amoriceau@bsfllp.com*
401 East Las Olas Blvd., Suite 1200
Fort Lauderdale, FL  33301
Tel: (954) 356-0011/ Fax: (954) 356-0022

KENYA K. DAVIS
*kdavis@bsfllp.com*
1401 New York Ave., NW
Washington, DC  20005
Tel: (202) 237-2727/ Fax: (202) 237-6131

*Attorneys for Plaintiffs Rosey Fletcher,*
*Erin O'Malley, and Callan Chythlook-Sifsof*

(Additional counsel listed on the following page)

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROSEY FLETCHER, ERIN O'MALLEY, AND CALLAN CHYTHLOOK-SIFSOF<br><br>Plaintiffs,<br><br>v.<br><br>PETER FOLEY, UNITED STATES SKI AND SNOWBOARD, AND UNITED STATES OLYMPIC AND PARALYMPIC COMMITTEE,<br><br>Defendants. | Case No. 23-cv-00803-SPG-JPR<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT UNITED STATES SKI AND SNOWBOARD'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br><br>Date: October 25, 2023<br>Time: 1:30PM<br>Crtm: 5C<br>Judge: Hon. Sherilyn Peace Garnett |

Additional counsel for Plaintiffs:

ERICA N. SWEETING
*esweeting@bsfllp.com*
55 Hudson Yards, 20th Floor
New York, NY  10001
Tel: (212) 446-2300/ Fax: (212) 446-2350

MARIAH J. NOAH (SBN 339658)
*mnoah@bsfllp.com*
44 Montgomery St, 41st Floor
San Francisco, CA 94104
Tel: (415) 293-6800/ Fax: (415) 293-6899

1

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

STATEMENT OF RELEVANT FACTS ................................................................... 2

LEGAL STANDARD ............................................................................................... 9

ARGUMENT ............................................................................................................ 9

A.   This Court Has Personal Jurisdiction Over USSS. ................................ 10

   1.   USSS' Contacts with California Meet and Surpass the
"Minimum Contacts" Required for Specific Jurisdiction. ........... 10

      a.   First, USSS Purposefully Availed Itself of the Privilege
of Doing Business in, and Directed its Actions at,
California. ................................................................................ 11

      b.   Second, Plaintiffs' Claims Arise from USSS's
California Related Conduct. ................................................... 14

      c.   Third, California's Exercise of Jurisdiction Over USSS
Is Reasonable. ........................................................................ 16

   2.   The Court also has General Jurisdiction Over USSS Because
USSS Maintains Continuous and Systematic Contact with
California. ..................................................................................... 17

   3.   The Civil RICO Statute Authorizes Personal Jurisdiction
Over USSS ................................................................................... 18

   4.   Jurisdictional Discovery. .............................................................. 19

B.   Plaintiffs' Claims Are Timely. ............................................................... 20

   1.   Plaintiffs' Sexual Assault Claims Are Timely ............................. 20

      a.   § 340.16 Revives Plaintiffs' Claims Even if the Sexual
Assault Occurred Before January 1, 2009 .............................. 21

      b.   Plaintiffs Properly Plead Sexual Assault Under
§340.16. .................................................................................. 22

      c.   § 340.16 Revives Plaintiffs' Sexual Assault Claims
Even if They Did Not Occur in California. ............................ 25

      d.   § 340.16 Revives Not Only Plaintiffs' Sexual Assault
Claims, But All Related Claims. ............................................ 26

   2.   Plaintiffs' RICO Claims Are Timely ............................................ 26

3.     Alternatively, Plaintiffs Are Entitled to Equitable Estoppel and/or Tolling. ..............................................................27

C.   Plaintiffs Have Successfully Alleged Valid RICO Violations Upon Which Relief Can Be Granted. ...........................................29

1.     USSS conducted and participated in the conduct of the Foley Sexual Abuse & Coverup Enterprise..............................29

2.     Defendants Engaged in a Pattern of Racketeering. ....................32

3.     The FAC Alleges RICO Injury......................................33

D.   Plaintiffs Have Successfully Alleged Valid Sex Trafficking and Forced Labor Violations Upon Which Relief Can Be Granted. .............35

1.     The FAC States a Claim for TVPRA Beneficiary Liability........35

2.     The FAC sufficiently Alleged a Cause of Action For Conspiracy to Commit Sex Trafficking Under the TVPRA. .......38

E.   Plaintiffs Have Successfully Alleged Common Law Claims. ...............39

1.     Negligence is Properly Maintained ..............................39

a.     USSS Had a Special Relationship with Plaintiffs and/or Foley, Whose Conduct Was Foreseeable. .........................40

b.     Plaintiff Callan Pleads She Was in USSS Custody When She Was Assaulted at a USSS Sponsored Event...............45

2.     Defendants Clearly Engaged in Negligent Supervision and Retention. ........................................................47

a.     Foley Injured Callan.......................................48

b.     USSS Knew or Should Have Known of Foley's Propensity for Abuse. ........................................................48

3.     Intentional Infliction of Emotional Distress. .............................52

CONCLUSION............................................................54

CERTIFICATE OF COMPLIANCE...............................................55

OPPOSITION TO DEFENDANT USSS'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

# TABLE OF AUTHORITIES

**Federal Cases**

*Abrahamson v. Berkley,*
  2016 WL 8673060 (E.D. Cal. Sept. 2, 2016) ........................................................ 19

*AirWair Int'l Ltd. v. Schultz,*
  73 F. Supp. 3d 1225 (N.D. Cal. 2014) ................................................................. 12

*Alix v. McKinsey & Co.,*
  23 F.4th 196 (2d Cir. 2022) ................................................................................. 34

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ................................................................................................ 9

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.,*
  874 F.3d 1064 (9th Cir. 2017) ........................................................................ 10, 11

*Bianco v. Warner,*
  562 F. Supp. 3d 526 (C.D. Cal. 2021) ................................................................. 28

*Boschetto v. Hansing,*
  539 F.3d 1011 (9th Cir. 2008) ............................................................................. 11

*Boy 1 v. Boy Scouts of Am.,*
  832 F. Supp. 2d 1282 (W.D. Wash. 2011) ..................................................... 45, 46

*Boyle v. United States,*
  556 U.S. 938 (2009) .............................................................................................. 32

*Bray v. Kendall,*
  2010 WL 56181 (N.D. Cal. Jan. 5, 2010) ............................................................ 18

*Brown v. USA Taekwondo,*
  40 Cal. App. 5th 1077 (2019), *aff'd,* 11 Cal. 5th 204 (2021) ......................... passim

*Burger King Corp. v. Rudzewicz,*
  471 U.S. 462 (1985) .................................................................................. 10, 13, 16

*Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv., Inc.,*
  788 F.2d 535 (9th Cir. 1986) ................................................................................ 18

*C.B. v. Moreno Valley Unified Sch. Dist.,*
  544 F. Supp. 3d. 973 (C.D. Cal. 2021) ........................................................... 52, 54

*Canyon Cnty. v. Syngenta Seeds, Inc.,*
  519 F.3d 969 (9th Cir. 2008) ............................................................................... 33

*Colonial Van & Storage, Inc. v. Superior Court,*
  76 Cal. App. 5th 487 (Cal. App. Ct. 2022) .......................................................... 53

*D.Z. v. Los Angeles Unified Sch. Dist.,*
  35 Cal. App. 5th 210 (2019) ................................................................................. 49

*Daimler AG v. Bauman,*
  571 U.S. 117 (2014) .............................................................................................. 17

*Devine v. Great Divide Ins. Co.,*
  350 P.3d 782 (Ala. 2015) ................................................................................ 48, 49

*Diaz v. Gates,*
  420 F.3d 897 (9th Cir. 2005) ............................................................................... 34

-iii-

*Doe #21 (S.H.) et al., v. CFR Enter., et al.*,
  2023 WL 4783591 (Cal.Ct.App. June 29, 2023) ...............................................22, 26

*Doe v. Bakersfield City Sch. Dist.*,
  136 Cal. App. 4th 556 (2006).......................................................................28

*Doe v. Mindgeek USA Inc.*,
  558 F.Supp.3d 828 (C.D. Cal. 2021).........................................................38

*Doe v. United States Youth Soccer*,
  8 Cal.App.5th 1118 (2017).........................................................................43

*Doe v. Wilhelmina Models, Inc.*,
  2021 WL 3727097 (S.D.N.Y. 2021) .....................................................25, 46

*Does 1-6 v. Reddit, Inc.*,
  51 F.4th 1137 (9th Cir. 2022)...................................................................35

*Farrell v. U.S. Olympic & Paralympic Comm.*,
  567 F. Supp. 378 (N.D.N.Y. 2021) ..........................................................17

*Fleites v. MindGeek S.A.R.L.*,
  617 F. Supp. 3d 1146 (C.D. Cal. 2022)....................................................38

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
  141 S. Ct. 1017 (2021).............................................................................14

*Gilbert v. MoneyMutual, LLC*,
  2018 WL 8186605 (N.D. Cal. Oct. 30, 2018)...........................................32

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  564 U.S. 915 (2011)..................................................................................17

*Grijalva v. Kevin Mason, P.A.*,
  2020 WL 2562825 (C.D. Cal. Apr. 10, 2020)...........................................32

*Guerrero v. Gates*,
  442 F.3d 697 (9th Cir. 2006).....................................................................34

*Hughes v. Pair*,
  46 Cal. 4th 1035 (2009)............................................................................52

*In re WellPoint, Inc. Out-of-Network UCR Rates Litig.*,
  865 F. Supp. 2d 1002 (C.D. Cal. 2011).....................................................29

*In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*,
  601 F. Supp. 3d 625 (C.D. Cal. 2022).......................................................19

*J.B. v. G6 Hosp.*,
  2020 WL 4901196 (N.D. Cal. Aug. 20, 2020).....................................35, 37

*J.M. v. Choice Hotels Int'l, Inc.*,
  2022 WL 10626493 (E.D. Cal. Oct. 18, 2022)..........................................37

*Jennifer C. v. Los Angeles Unified Sch. Dist.*,
  168 Cal. App. 4th 1320 (2008)..................................................................49

*Jensen v. United States Tennis Ass'n*,
  2021 WL 1226625 (D. Kan. Apr. 1, 2021) ...............................................36

*Jones v. Billionaire Burgers, Inc.*,
  2023 WL 1107866 (C.D. Cal. Jan. 26, 2023) .............................................9

*Juarez v. Boy Scouts of America, Inc.*,
  81 Cal.App.4th 377 (2000)........................................................................43

-iv-

*Kashef v. BNP Paribas SA*,
  2021 WL 603290 (S.D.N.Y. Feb. 16, 2021) ........................................46

*Kirsopp v. Yamaha*,
  2014 WL 12577429 (C.D. Cal. Aug. 27, 2014) ...............................14, 15

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ............................................................35

*Kroll v. Cnty. of Los Angeles*,
  2022 WL 2102894 (C.D. Cal. Apr. 28, 2022) ..................................28

*Krypt, Inc. v. Ropaar LLC*,
  2020 WL 32334 (N.D. Cal. Jan. 2, 2020) ..........................................19

*Leonard v. City of Los Angeles*,
  208 Fed. Appx. 517 (9th Cir. 2006) ...............................................34

*Logan v. Zimmerman Brush Co.*,
  455 U.S. 422 (1982) ........................................................................33

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
  519 F.3d 1025 (9th Cir. 2008) ...........................................................9

*Marvix Photo, Inc. v. Brand Techn.*,
  647 F.3d 1218 (9th Cir. 2011) ...........................................................13

*McCann v. Foster Wheeler LLC*,
  225 P.3d 516 (Cal. 2010) ..................................................................25

*Mendoza v. Zirkle Fruit Co.*,
  301 F.3d 1163 (9th Cir. 2002) ...........................................................35

*Morrill v. Scott Fin. Corp.*,
  873 F.3d 1136 (9th Cir. 2017) ...........................................................13

*Mountain Copper Co. v. Welcome Growers Gin Co.*,
  197 Cal. App. 2d 253 (Ct. App. 1961) ..........................................50, 51

*Norwood v. Children & Youth Servs. Inc.*,
  2011 WL 13130697 (C.D. Cal. 2011) ..............................................25

*Odom v. Microsoft Corp.*,
  486 F.3d 548 (9th Cir. 2007) .........................................................29, 32

*Ortega v. Pajaro Valley Unified Sch. Dist.*,
  64 Cal. App. 4th 1023 (1998) ..........................................................28

*Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) ...........14, 16

*Parker v. Walker*,
  6 Cal. Rptr. 2d 908 (Cal. Ct. App. 1992) ......................................33

*Picot v. Weston*,
  780 F.3d 1206 (9th Cir. 2015) ...........................................................11

*Pincay v. Andrews*,
  238 F.3d 1106 (9th Cir. 2001) ...........................................................26

*Potomac Elec. Power v. Elec. Motor Supply*,
  262 F.3d 260 (4th Cir. 2001) ............................................................34

*Powers-Barnhard v. Butler*,
  2020 WL 4925333 (N.D.N.Y. Aug. 21, 2020) ...............................17

OPPOSITION TO DEFENDANT USSS'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

*Rano v. Sipa Press, Inc.*,
    987 F.2d 580 (9th Cir. 1993) .................................................................. 10

*Regents of Univ. of California v. Superior Ct.*,
    4 Cal. 5th 607 (2018) ............................................................................ 39

*Riot Games v. John Does 1-10*,
    2022 WL 18358951 (C.D.C.A. 2022) ................................................... 14

*Rowland v. Christian*,
    69 Cal. 2d 108 (1968) ............................................................................ 40

*Russell v. Maman*,
    2019 WL 13039744 (N.D. Cal. June 19, 2019) .................................... 32

*RV Savvy Prod. v. RV Masters*,
    2019 WL 5858192 (D. Or. 2019) ..................................................... 12, 14

*Sanchez ex rel. Sanchez v. Wal-Mart Stores, Inc.*,
    125 Nev. 818 (2009) .............................................................................. 44

*Sanford v. MemberWorks, Inc.*,
    625 F.3d 550 (9th Cir. 2010) ................................................................. 29

*Schwarzenegger v. Fred Martin Motor Co.*,
    374 F.3d 797 (9th Cir. 2004) ................................................................. 12

*Shields v. FINA*,
    419 F. Supp. 3d 1188 (N.D.C.A. 2019) ................................................. 14

*Sinatra v. Nat'l Enquirer, Inc.*,
    854 F.2d 1191 (9th Cir. 1988) ............................................................... 16

*Skout, Inc. v. Jen Processing, Ltd.*,
    2015 WL 224930 (N.D.C.A. 2015) ....................................................... 14

*Supermail Cargo, Inc. v. United States*,
    68 F.3d 1204 (9th Cir. 1995) ................................................................. 20

*Thomas v. Baca*,
    308 Fed. Appx. 87 (9th Cir. 2009) ........................................................ 33

*United States v. Christensen*,
    828 F.3d 763 (9th Cir. 2015) ................................................................. 32

*United States v. Flucas*,
    22 F.4th 1149 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 320 (2022) ....... 22

*Valadez-Lopez v. Chertoff*,
    656 F.3d 851 (9th Cir. 2011) ................................................................... 6

*Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
    433 F.3d 1199 (9th Cir. 2006) ............................................................... 11

*Young v. Salt Lake City Sch. Dist.*,
    52 P.3d 1230 (Utah 2002) ................................................................ 45, 46

*ZF-TRW Airbag Control Units Prod.*,
    2022 WL 19425927 (C.D. Cal. Mar. 2, 2022) ...................................... 19

**Statutes**

18 U.S.C. §1590 ......................................................................................... 35

18 U.S.C. §1591(a)(2) ........................................................................... 26, 37

18 U.S.C. §1594.................................................................................................37, 40

18 U.S.C. §1595.................................................................................................37, 40

18 U.S.C. §1961(4)...................................................................................................31

18 U.S.C. §1965(b)...................................................................................................11

California Bill Analysis, A.B. 2777.........................................................................22

OPPOSITION TO DEFENDANT USSS'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs Rosey Fletcher, Erin O'Malley, and Callan Chythlook-Sifsof (together, "Plaintiffs"), by and through their undersigned attorneys, submit this response to Defendant United States Ski and Snowboard's ("USSS") Motion to Dismiss (ECF No. 81) ("Mot."). In support thereof, Plaintiffs submit as follows:

## INTRODUCTION

On August 8, 2023, SafeSport—United States Olympic and Paralympic Committee's ("USOPC") own internal investigator—***finally found that Defendant Peter Foley sexually abused athletes*** and suspended him for 10 years with 5 years probation, effectively ending his coaching career.[1] Simultaneously, SafeSport suspended USSS Board member, Lisa Kosglow, for obstructing that investigation. These actions come decades after Rosey, Erin, and Callan's sexual abuse and approximately two years after their bravery of coming forward publicly. It took years to remove Foley—a sexual predator—despite the constant red flags, USSS and USOPC executives' awareness, and the victims' attempts to report Foley's abuse.

Foley could not freely sexually abuse his athletes but for USSS and USOPC's facilitation of his abuse—giving him access to and coercive control over elite athletes. Indeed, USOPC, through its new CEO, has now admitted that they "recognize [their] role in failing to protect these athletes, and are sorry for the profound hurt they have endured" when it comes to the Olympic gymnasts Larry Nassar sexually abused.[2] Just like the Nassar case, USSS and USOPC failed in their duties to protect snowboarders from sexual abuse.

While USOPC attempts to distance itself from the National Governing Bodies (NGBs), it holds significant authority over NGBs. USSS's goal is to get coaches and

---

[1] Although SafeSport finished its investigation by January 2023, the report was not released until August, after Plaintiffs filed their First Amended Complaint (FAC). *See*, ECF No. 53 at ¶199. SafeSport's report inevitably contains facts and findings that could have informed Plaintiffs in considering additional factual allegations.

[2] https://www.nytimes.com/2021/12/13/sports/olympics/nassar-abuse-gymnasts-settlement.html

athletes to the Olympics. USOPC opens or closes that door, deciding who represents the U.S. USOPC provides substantial funding to USSS and certifies which entities qualify as NGBs. *See* FAC ¶44. As noted in its motion,

> USOPC's fundamental statutory role with respect to the NGBs (apart from selecting which organizations to certify as NGBs) is to **ensure that** (1) the **NGB's procedures for selecting the Olympic**, Paralympic, Pan-American, and Parapan American **athletes are fair and provide individuals with an equal opportunity** to participate in those games, and (2) the **NGBs have policies** in place concerning, for example, **athlete safety** and governance.

ECF No. 80 at 3–4 (citing 36 U.S.C. §§ 220521(a), 220522(8) & (15), 220505(d).

USOPC certified USSS as an NGB, but failed to ensure USSS had procedures to provide **equal** opportunity because the U.S. Olympic Snowboarding Team's head coach was sexually abusing some of his athletes. USOPC failed to ensure USSS had effective policies for athlete safety where athletes were sexually abused by their head coach and minor athletes raped by adult leaders. Instead, USSS and USOPC saw athletes as commodities— "medals and money" as a former executive put it—a phrase uttered at every meeting. FAC ¶41. Wins and profits dominated USOPC's and USSS's mission statements, which tout protecting, supporting, and leading athletes, coaches, and Olympic teams. As to sexual abuse, their actions and inactions tell the true priorities.

For the reasons below, Defendants Foley, USSS, and USOPC must be held accountable for their actions and the suffering Plaintiffs endured; thus, their respective motions to dismiss should be denied.[3]

## STATEMENT OF RELEVANT FACTS

USOPC's ability to exert authority and control over the NGBs, like USSS, is clear when it comes to its response to the issue of athlete-use of banned substances. In

---

[3] Defendants—Foley, USOPC, and USSS—filed motions to dismiss. *See* ECF No. 78, 80, 81 respectively. While this Opposition is against USSS's motion, arguments against Defendants Foley and USOPC are incorporated herein for efficiency.

the 1990s and early 2000s, USOPC enacted strict policies to ensure athletes continued bringing in "medals and money" by banning doping and other substances. *Id.* ¶43. Using substances led to suspension, impacting USOPC's and USSS's profit. *Id.*

Unlike the aggressive and appropriate stance taken against banned substances, USSS and USOPC lacked systems to investigate, supervise, monitor, or train the Team's staff to prevent sexual assault, verbal abuse, grooming, sexual harassment, or molestation of children/young adults during the time Plaintiffs were sexually abused and harassed by Foley who was twice their age. *Id.* ¶42. USSS and USOPC had the ability to protect athletes from sexual abuse, but chose not to.

Indeed, USOPC viewed protecting athletes from sexual abuse as a liability. *Id.* ¶46. In December 2011, USOPC executives tried blocking publication of an athletes' sexual abuse handbook. USOPC's executive overseeing abuse emailed USOPC's CEO, Scott Blackmun: "while several NGBs expressed that the (sexual abuse prevention) handbook sets the proper focus…there is also a perception that publishing the handbook will increase the risk of liability." *Id.* USOPC's reluctance is embodied in its handling of Nassar's sexual abuse of 500+ women, including 50 gymnasts. *See id.* ¶44. Nassar abused gymnasts for decades without recourse despite USOPC's knowledge. *Id.* USOPC, through its new CEO, admits their "role in failing to protect these athletes," and expressed sorrow for the profound hurt the athletes endured.[4] USOPC similarly failed the Plaintiffs and are now left to seek this admission before this Court.

Plaintiffs, like other athletes had dreams of one day representing the U.S. at the Olympics. USOPC represents the pinnacle of financial success, and for athletes in their sport, it's the *only* option to compete, perform, and get competitive sponsorships. *Id.* ¶49. What Plaintiffs could not anticipate is how "[i]ndividual athletes have almost no

---

[4]   https://www.nytimes.com/2021/12/13/sports/olympics/nassar-abuse-gymnasts-settlement.html.

power in [the] system, instead [USOPC and USSS] . . . hold the dreams of athletes in their hands and athletes fear these coaches and administrators, armed with congressionally granted monopoly power will retaliate if they protest or dissent." *Id.* ¶37. Unfortunately, Plaintiffs quickly learned because of their abusive coach, Foley.

Foley was the first and only head coach for men and women's snowboarding until he was fired in 2022. *Id.* ¶62. He held tremendous control and created a toxic culture that normalized and invited sexual predators to prey on female athletes. Athletes and coaches, including Foley, often made crude sexual comments and spoke about previous sexual experiences including where women were degraded and coerced into sexual activity. *Id.* ¶77. Rather than correct coaches and athletes, Foley encouraged them by talking about pornography and sexual acts. *Id.* ¶78. Foley further cultivated this inappropriate environment by bringing young/minor female athletes to bars and nightclubs, where Foley would stare lewdly at young women, including teammates, making crude comments about their bodies. *Id.* ¶75. Foley often invited female athletes to his hotel room where other young female athletes would be in bed with him. *Id.* ¶73.

The Team's sexual harassment was not only verbal, but physical. Male athletes regularly got intoxicated and tried to kiss female athletes without their consent, while male coaches, including Foley, only smacked female athletes' butts after races. *Id.* ¶¶160–61. Indicative of this abusive culture, a male coach licked spilled barbeque sauce off of a female athlete's chest without her consent. *Id.* ¶162. Male coaches and athletes, including Foley, would burst into female athletes' rooms, jump on their beds, and "hump" or imitate sexual acts with female athletes' legs. *Id.* ¶163. These men would also grab female athletes' bras and run down the hall with them. *Id.* ¶164.

There were no boundaries—this was true whether the Team was at a training camp or a USSS- and USOPC-sponsored competition. Foley fostered an environment that made it easy and normal to sexually abuse his female athletes. Foley often directed male and female athletes, coaches, and employees to share rooms and even beds. *Id.*

¶60. Foley would also share beds with his female athletes who were often half his age. *Id.* That is how Foley was able to sexually assault Rosey for the first time in spring of 1994. *Id.* ¶85. After training at Mammoth Mountain in California, Foley drove the Team to Reno, Nevada, where they stayed overnight to catch their morning flights. *Id.* Rosey, nineteen, shared a bed with a female teammate when Foley unexpectedly snuck into their bed. *Id.* Without Rosey's consent, Foley deliberately reached over and digitally penetrated her. *Id.* ¶86. Foley abused Rosey again. In 1997, Foley forcibly kissed Rosey after a postrace event. *Id.* ¶87. After she won Bronze, Foley maintained his power by reminding Rosey of his previous assault, whispering in her ear that he remembered "how she was breathing" when he had sexually assaulted her in 1994. *Id.* ¶90. Rosey knew Foley controlled the Team and could determine her career— "whatever [Foley] says goes." *Id.* ¶81. Rosey was terrified of physical and professional retaliation and therefore initially kept quiet. *Id.* ¶92.

Rosey was not Foley's only victim. He sexually assaulted another snowboarder, Erin. *Id.* ¶103. After a competition, Foley cornered Erin in an elevator, pinned her against the wall, forcibly groped her, and attempted to kiss her. *Id.* Foley assaulted Erin in front of Rosey and USSS personnel. *Id.* Erin tried to escape Foley with Rosey, but Foley—then a middle-aged man—chased the two young women to their room. *Id.* ¶104. Erin and Rosey pleaded with Foley to leave them alone, begging him to stop and telling him "no." *Id.* ¶105. Only after Erin hid on the other side of a bed and Rosey's continued pleading did Foley leave. *Id.* ¶106.

Foley also verbally and mentally abused Erin. Since Erin was 15 years old, Foley would call her "chubby," telling her to lose weight. *Id.* ¶100. Foley verbally praised Erin when she lost weight even though being lighter negatively impacted her snowboarding performance. *Id.* ¶102. His sexual, verbal, and mental abuse led to Erin's eating disorder and early retirement. *Id.* ¶109–10. Erin was terrified of Foley, so she, too, kept quiet. *Id.* ¶111.

This inappropriate environment was so pervasive and widespread that even minors were sexually abused and harassed. Callan began competing at the elite level in snowboarding when she was just 14 and that's also when she met Foley, and when he whispered in her and another teammate's ears while pointing to a young girl at a bar that he wanted to "put [his] tongue inside her pussy." *Id.* ¶118. Callan later learned Foley took nude photos of female athletes including young Team members, her peers and her competitors. *Id.* ¶119.

All Defendants failed Callan in 2005, when Callan, sixteen, attended her first Junior World Championship for the Team. *Id.* ¶126. Callan depended on USSS to provide a safe environment, especially overseas. *Id.* ¶¶124–26. Instead, Callan was encouraged to attend a party with junior athletes and coaches, and given significant alcohol by adults entrusted with her care. *Id.* ¶129. USSS personnel, Abbi Nyberg[5] and Jon Casson, did nothing to protect Callan from the sexual advances of a Czech coach nearly three times Callan's age. *Id.* ¶129. The Czech coach who raped Callan that night led her away from a party just feet away from the people who were supposed to protect her. *Id.* ¶130.

In fear of retaliation and re-traumatization, Callan kept quiet and did not report. Even her teachers observed an immediate change in her behavior; it would take over a decade for Callan to feel safe enough to reveal what happened to her. After her assault, Callan distanced herself from Foley. *Id.* ¶135. As a result, she stopped receiving adequate coaching from Foley, and was required to pay back thousands of dollars in lodging—something that went against protocol. *Id.* ¶¶137–38. Callan's lack of safety and trust around Foley and the Team severely affected her mental health and athletic

---

[5] USSS speciously asserts the Court should disregard the fact that Abbi Nyberg "explicitly told [Callan] that she could drink alcohol" because it is somehow "directly contrary to the first Complaint, which alleged that Nyberg gave Callan 'verbal 'cautions' not to drink.'" Mot. 6 n.5. First, these facts are not "directly contrary." *See* FAC ¶113. Second, "it is well-established that an amended complaint supersedes the original, the latter being treated thereafter as non-existent." *Valadez-Lopez v. Chertoff*, 656 F.3d 851, 857 (9th Cir. 2011).

performance. *Id.* ¶140. Callan waited to speak out because she knew Foley's power in the snowboarding community. It was only years later when Callan became a coach for the U.S. Paralympics Snowboarding National Team that she knew she had to say something to protect the athletes in her care. *Id.* ¶¶115, 141–42.

The women's fear that Foley was too powerful to be punished was well-founded since USSS and USOPC did nothing to investigate Foley, and instead covered-up his abuse for years. USSS and USOPC executives and employees were aware of the toxic culture early. Jeremy Forster, USSS's Director of Snowboarding Freeski & Freestyle and at the time, Foley's supervisor, often attended Team outings with Foley, including at bars and nightclubs, where Foley put his inappropriate behavior on full display. *Id.* ¶75. Alan Ashley, USOPC Chief of Sport Performance would also attend and was known to be Foley's close friend. *Id.*

Ashley prided himself on finding out "as much as [he] possibly [could]" about the Team to ensure its success. *Id.* ¶223. Forster nor Ashley tried to protect the Team although they knew or should have known Foley's behavior was abusive and inappropriate. *Id.* ¶175. Unfortunately, this is standard behavior for Ashley. *Id.* ¶223. Ashley, a USOPC executive and agent, was fired in December of 2018 for ignoring allegations of Nassar's sexual abuse against female gymnasts. *Id.* Like with Nassar, it is not apparent that Ashley did anything to stop Foley's sexual misconduct.

USSS and USOPC protected Foley even after Congress required employees, coaches, members, and license holders to report allegations of sexual misconduct or child abuse. *Id.* ¶¶173–74. SafeSport was created in 2017 by Congressional mandate after Congress' investigation into wide-spread sexual abuse and USOPC's cover-up of the same across the Olympic movement. SafeSport's mandate is to investigate and resolve allegations of sexual misconduct within USOPC and NGBs. *Id.* ¶¶167, 172. Anyone with governance over USOPC and USSS and contact with or authority over athletes have reporting obligations. *Id.* ¶174. These reporters are "Adult Participants"

1  and are required to report suspected abuse timely. *Id.* ¶¶173–74. USOPC and USSS

2  failed to report, interfered with the investigation, and ultimately failed to protect

3  athletes from a sexual predator. Before coming forward publicly in February 2022,

4  Callan reported Foley's sexual misconduct to Gale "Tiger" Shaw, former USSS CEO,

5  informing him she knew of Foley's sexual misconduct. *Id.* ¶¶144, 176. Shaw did

6  nothing. *Id.*[6] Prior to 2022, Callan tried reporting Foley's abuse to Nyberg, former

7  USSS program manager and she did nothing. *Id.* ¶177. Callan informed Jeffrey

8  Archibald, the Team's assistant coach, that Foley was taking nude photos of young

9  women on the Team and within USSS, and he did nothing. *Id.* ¶178.

10  Rosey and Erin also came forward as Foley's sexual abuse survivors. *Id.* ¶150.

11  In March of 2022, Erin and Callan reported Foley to USSS's general counsel, Alison

12  Pitt. *Id.* ¶170. Pitt falsely told the women that they could not make a report to SafeSport

13  if they wished to remain anonymous. *Id.* She also warned them that they would have

14  to confront Foley personally, something that again was not true. *Id.* Pitt did nothing but

15  scare Plaintiffs, making them more hesitant to report. *Id.* ¶180. However, these

16  Plaintiffs did not stop with Pitt. Rosey and Erin reported Foley to Sophie Goldschmidt,

17  USSS's recently appointed president and CEO. *Id.* ¶182. Goldschmidt was equally

18  unhelpful, telling the athletes that it was an "extensive and challenging reporting

19  process," and did nothing. *Id.* Kosglow, a USSS board member, even interfered; as

20  Foley's friend and neighbor, Kosglow called Rosey and Erin on his behalf, telling them

21  how "devastated" he was "as a result of the abuse reports." *Id.* ¶184–85. Like Foley,

22  the recent SafeSport investigation concluded that Kosglow, too, violated the applicable

23  policies and issued against her a 3-year suspension and 2-year probation.

24  _____

25  [6] USSS inexplicably argues Plaintiffs' voluntary dismissal of Shaw is an
   "acknowledgement that the claims against Shaw, USSS's former CEO, were frivolous"
26  and then attempts to extend that conclusion to the claims against USSS. Mot. 14 n.2.
   The allegations are far from frivolous. Shaw ignored reports of sexual abuse and failed
27  to report to SafeSport as required or do anything. Additionally, USSS is responsible
   for its executives' actions beyond Shaw, as detailed above, who learned of sexual abuse
28  and many red flags, and did nothing.

USSS and USOPC temporarily suspended Foley only when the allegations were public. However, this was a façade; his suspension was never enforced. *Id.* ¶¶151, 188. During USOPC suspension, Foley was in the Women's Snowboard Cross Finish restricted area, and while on USSS suspension he attended a post-Olympics competition. *Id.* Further, USSS publicly "clarified" Foley was not punished for the sexual misconduct allegations. *Id.* ¶190. When USSS later fired Foley, their public narrative was that he was not fired over the sexual abuse allegations. *Id.*

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss, courts must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins.*, 519 F.3d 1025, 1031 (9th Cir. 2008). This includes "drawing all reasonable inferences in favor of the plaintiff. *Jones v. Billionaire Burgers.*, 2023 WL 1107866, at *6 (C.D. Cal. Jan. 26, 2023). Federal Rule of Civil Procedure 8(a)(2) only requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 678. "[D]etailed factual allegations" are not required. *Id.*

## ARGUMENT

Defendants all filed motions to dismiss pursuant to Rule 12(b)(6), arguing that the Court does not have personal jurisdiction over them. The Court should deny all of Defendants' motions to dismiss because (A) this Court has personal jurisdiction over Plaintiffs' claims and over Defendants; (B) Plaintiffs' claims are timely; and (C) Plaintiffs have successfully pleaded valid causes of action upon which relief can be granted.

**A.** **This Court Has Personal Jurisdiction Over USSS.**

This Court's jurisdiction over USSS is clear based on the allegations in the First Amended Complaint (FAC). "For a court to exercise personal jurisdiction over a nonresident defendant, that defendant must have at least 'minimum contacts' with the relevant forum such that the exercise of jurisdiction 'does not offend traditional notions of fair play and substantial justice.'" *Schwarzenegger v. Fred Martin Motor*, 374 F.3d 797, 801 (9th Cir. 2004). The Court has specific jurisdiction over USSS because it purposefully availed itself of the forum, Plaintiffs' claims arise from USSS's California-related conduct, and the exercise of jurisdiction is reasonable. As a result, USSS has the minimum contacts required with California to render jurisdiction fair and just. While the Court need only have jurisdiction over Defendant through a single method, specific jurisdiction, there are two additional bases for the Court's jurisdiction. The Court also has general jurisdiction over USSS based on USSS's "continuous and systematic" California presence. Moreover, the civil RICO statute provides jurisdiction by way of its nationwide service of process provision—18 U.S.C. §1965(b).

**1. USSS' Contacts with California Meet and Surpass the "Minimum Contacts" Required for Specific Jurisdiction.**

Specific jurisdiction exists when plaintiff's claims "arise out of or relate to" the defendant's contacts with the forum. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). Courts may assert specific jurisdiction over a claim for relief arising out of the defendant's forum-related activities. *See Rano v. Sipa Press*, 987 F.2d 580, 588 (9th Cir. 1993). The Ninth Circuit applies a three-part test: (1) the defendant must either "purposefully direct his activities" toward the forum or "purposefully avail[ ] himself of the privileges of conducting activities in the forum"; (2) "the claim must be one which arises out of or relates to the defendant's forum-related activities"; and (3) "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable." *Axiom Foods  v. Acerchem Int'l*, 874 F.3d 1064, 1068 (9th Cir.

1   2017) (emphasis added). "The plaintiff has the burden of proving the first two prongs."

2   *Picot v. Weston*, 780 F.3d 1206, 1211–12 (9th Cir. 2015). If she does, the burden shifts

3   to the defendant to "set forth a 'compelling case' that the exercise of jurisdiction would

4   not be reasonable." *Id.* at 1212.

5               **a.  First, USSS Purposefully Availed Itself of the Privilege**

6                   **of Doing Business in, and Directed its Actions at,**

7                   **California.**

8         USSS purposefully availed itself of the privilege of doing business in, and

9   directed its actions at, California by sponsoring training camps and competitions in

10  California, recruiting California-resident athletes, hosting fundraising events in

11  California, and more. The first prong is met by showing either USSS purposefully

12  availed itself of the privilege of doing business in California (purposeful availment) or

13  USSS purposefully directed its actions at California (purposeful direction). "To have

14  purposefully availed itself of the privilege of doing business in the forum, a defendant

15  must have 'performed some type of affirmative conduct which allows or promotes the

16  transaction of business within the forum state.'" *Boschetto v. Hansing*, 539 F.3d 1011,

17  1016 (9th Cir. 2008). Conversely, when applying a "'purposeful direction' test[, courts]

18  look to evidence that the defendant has directed his actions at the forum state, even if

19  those actions took place elsewhere." *Picot*, 780 F.3d at 1212. Often referred to as the

20  'effects' test, Plaintiffs show purposeful direction where the defendant has "(1)

21  committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm

22  that the defendant knows is likely to be suffered in the forum state." *Axiom Foods*, 874

23  F.3d at 1069.

24        "This [first] prong includes both purposeful availment and purposeful direction.

25  It may be satisfied by purposeful availment of the privilege of doing business in the

26  forum; by purposeful direction of activities at the forum; *or by some combination*

27  *thereof.*" *Yahoo!  v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199,

28

1206 (9th Cir. 2006) (emphasis added). "[H]arm must be suffered in the forum state, but it does not matter if even more harm might have been suffered in another state." *RV Savvy Prod. v. RV Masters*, 2019 WL 5858192 *5 (D. Or. 2019). Alone "[i]ndividual contacts with a forum state may not establish personal jurisdiction, but viewed as a whole, may establish personal jurisdiction." *Id.*

Here, while USSS need only meet the purposeful availment or the purposeful direction test—or some combination of both as the *Yahoo!* court explained—USSS meets both. USSS purposefully availed itself of doing business in California by: recruiting many of its athletes from California, supporting ski and snowboard clubs throughout California as feeders to USSS teams, hosting fundraisers that solicited funds from California residents and corporations, and sending USSS Teams to competitions in California. Further, by sponsoring a training camp at Mammoth Mountain in California and hosting fundraisers in California, it is a reasonable inference that USSS has entered into contracts with California businesses. USSS collects membership dues from, and also offers insurance to, California ski clubs through its insurance broker. [7]

USSS's Snowboarding Team, to which Plaintiffs were members and Foley head-coach, is made up of approximately twenty-five percent California residents.[8] USSS made intentional acts by taking many steps to recruit from and send athletes to California for training, resulting in Foley's sexual abuse. *AirWair Int'l Ltd. v. Schultz*, 73 F. Supp. 3d 1225, 1233 (N.D. Cal. 2014) (Noting that the "threshold of what

---

[7] The court "may consider extrinsic evidence" when evaluating a motion to dismiss on jurisdictional grounds. *Schwarzenegger*, 374 F.3d at 800; *see also* https://my.usskiandsnowboard.org/my-ussa/club-membership-club-minimum-standards (detailing the many benefits that USSS offers its club members—including California clubs—in exchange for dues).

[8] Thirteen of the fifty-four athletes named to the 2023-2024 U.S. Snowboard Team are from California. U.S. Ski and Snowboard Association, <u>2023-24 U.S. Snowboard Team Nominations Announced</u> (2023), https://usskiandsnowboard.org/news/2023-24-us-snowboard-team-nominations-announced.

constitutes an intentional act is relatively low."). USSS's conduct was intentionally aimed at California when it recruited Plaintiff Erin and it was also aimed at California when USSS traveled during a California training camp—although the hotel was in Reno, Nevada. *See Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1143 (9th Cir. 2017) (holding that under the "effects" test's second prong, the Court considers two factors: first, whether the relationship between the defendant, the forum, and the litigation arose out of contacts the defendant deliberately created with the forum, and second, whether the defendant's contacts were with the forum rather than merely with persons residing in the forum).

Finally, Plaintiffs suffered harm in California. USSS wants to take the view that this case is about a handful of instances of sexual assault and sexual abuse. To believe Plaintiffs only suffered harm during those specific penetrations or lewd acts is to wholly misunderstand sexual assault entirely and the impact that a middle-aged head-coach's actions have on young women who have focused their lives on getting to the Olympics. The impact is all the greater when that young woman is a minor. Plaintiffs suffered harm whenever they were around Foley and subject to the environment of abuse he created, including every USSS-sponsored training, competition, and fundraiser they attended in California as members of the Team, led by their abuser.

Courts have given general guidance on what amount of contacts by a defendant allow for specific jurisdiction. "[T]the forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State and those products subsequently injure forum consumers." *Burger King*, 471 U.S. at 473. The Ninth Circuit held the "maintenance of a passive website alone cannot satisfy the express aiming prong"; only operating "a passive website in conjunction with 'something more'—conduct directly targeting the forum—is sufficient." *Marvix Photo, v. Brand Techn.*, 647 F.3d 1218,

1229 (9th Cir. 2011). Courts consider multiple factors to determine if a defendant has done "something more," including: "the interactivity of defendant's website, the geographic scope of the defendant's commercial ambitions, and whether the defendant individually targeted a plaintiff known to be a forum resident." *RV Masters*, 2019 WL 5858192 *5.

USSS's California contacts are far greater than other defendants California federal courts have found to be sufficient to support jurisdiction. *See Shields v. FINA*, 419 F. Supp. 3d 1188, 1207 (N.D.C.A. 2019) ("Plaintiffs have made a prima facie showing that Defendant purposefully directed its anticompetitive conduct at the [forum] by knowingly interfering with USA Swimming and ISL's plans to host a competition in the United States); *Riot Games v. John Does 1-10*, 2022 WL 18358951 *2 (C.D.C.A. 2022) (finding sufficient contacts with California where defendants sent emails, chats, and texts to California residents); *Skout, v. Jen Processing, Ltd.*, 2015 WL 224930 *3 (N.D.C.A. 2015) (finding sufficient contacts where a defendant-company's activity directed toward California was spamming California website users with unwanted chat messages).

### b. Second, Plaintiffs' Claims Arise from USSS's California Related Conduct.

Plaintiffs meet the second part of the three-part test, because Plaintiffs' claims arise out of USSS' California related conduct. To determine whether a plaintiff's claims arise out of or result from defendant's activities, the court applies a "but for" test. *See Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998), whether Plaintiff would not have been injured "but for" defendant's conduct directed towards California. *Id.* "None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." *Ford Motor v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).

USSS mistakenly relies on *Kirsopp v. Yamaha* to support its contention that its contacts with the state are not sufficiently connected to the allegations involved in this case. 2014 WL 12577429 (C.D. Cal. Aug. 27, 2014); *see* Mot. 28–29. The *Yamaha* court only held there was no causal link sufficient to support specific jurisdiction because "Yamaha Japan's foray into the U.S. market sixty years ago does not support jurisdiction today." *Id.* at *6. Where Yamaha's forum contacts took place more than 60 years before the alleged conduct at issue, USOPC's California contacts existed when the conduct at-issue occurred and remain ongoing.[9]

Here, USSS depends on California to run its Team and the approximately twenty-five percent of its members that are California residents. The facts pled in the FAC identify the direct causal relationship between USSS' California conduct and the resulting injuries suffered by Plaintiffs. For instance, Plaintiff Erin—a California resident—was "mentally and verbally abused and sexually assaulted and harassed at USSS- and USOPC-sponsored competitions by Foley." FAC ¶¶14, 99. Plaintiff Rosey was first sexually assaulted by Foley in 1994, as a direct result of USSS forum related contacts. FAC ¶85. That is, Rosey was on a trip to a USSS-sponsored training at Mammoth Mountain, California when she was assaulted by Foley in a nearby hotel in Reno, Nevada. "But for" USSS' conduct in California, Plaintiffs would not have been harmed. This requirement is met.

---

[9] In a footnote, USSS accuses Plaintiffs of "intentionally misleading the Court by alleging that [Rosey] was sexually assaulted when she was invited to and attended a Mammoth Mountain training camp" and in the very next sentence cite facts from Plaintiffs' FAC as proof of the correct fact.  Mot. 28.  USSS's allegation is nothing more than an attempt to devalue the critical fact that Rosey was assaulted when on a trip to California and persist in their narrow view that only the exact moment that Foley penetrated Rosey is relevant when determining the venue of the conduct.

### c. Third, California's Exercise of Jurisdiction Over USSS Is Reasonable.

Once the first two prongs of the specific jurisdiction analysis are satisfied for specific jurisdiction, "the burden then shifts to [defendant] to 'present a compelling case' that the exercise of specific jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802 (quoting *Burger King* at 476-78). The court is to:

> [C]onsider seven factors when assessing reasonableness: (1) the extent of a defendant's purposeful interjection; (2) the burden on the defendant in defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Panavision*, 141 F.3d at 1323 (*see also Burger King*, 471 U.S. at 476–77). "No one factor is dispositive; a court must balance all seven." *Panavision*, 141 F.3d at 1323.

Here, Defendant fails to meet its burden as finding that this Court has specific jurisdiction over USSS is beyond reasonable as: (1) USSS' extensive contacts with California show USSS purposefully interjected itself into California; (2) given that USSS has employees, athletes, training camps, and more in California, the burden on USSS defending in the forum is low; (3) there is little conflict with the sovereignty of USSS's state as sovereignty concerns weigh more heavily when the defendants have no United States-based relationships, *see Sinatra v. Nat'l Enquirer*, 854 F.2d 1191, 1199 (9th Cir. 1988) and each of the defendants are domiciled in different states; (4) California has a strong interest in adjudicating sexual abuse and misconduct inflicted in conjunction with USSS's California conduct and has shown that interest in passing the new California look-back statute for sexual abuse; (5) California is the most efficient jurisdiction as there are many California state law claims; (6) litigating this matter in California is important given the state's look-back statute and the state causes of action; and (7) no alternative forum exists where all Plaintiff's causes of action could

1    be heard.   Therefore, USSS cannot meet its burden of showing the exercise of

2    jurisdiction to be unreasonable; thus, this Court should exercise jurisdiction over USSS.

3         **2.   The Court also has General Jurisdiction Over USSS Because**

4              **USSS Maintains Continuous and Systematic Contact with**

5              **California.**

6         "A court may assert general jurisdiction over foreign (sister-state or foreign

7    country) corporations to hear any and all claims against them when their affiliations

8    with the State are so 'continuous and systematic' as to render them essentially at home

9    in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915

10   (2011); *Daimler AG v. Bauman*, 571 U.S. 117, 137, 139 n.19 (2014).   USSS relies on

11   two cases where courts found that New York did not have jurisdiction over an NGB's

12   (US Speedskating and USA Volleyball).   *See* ECF 81 at 24 (citing *Farrell v. U.S.*

13   *Olympic & Paralympic Comm.*, 567 F. Supp. 378, 387-86 (N.D.N.Y. 2021); *Powers-*

14   *Barnhard v. Butler*, 2020 WL 4925333, at *4-5 (N.D.N.Y. Aug. 21, 2020).   However,

15   in those cases the NGB's contacts with New York were the same or similar to their

16   level of contacts in the other fifty states.

17        Here, California is not just one of the fifty states for USSS but plays a major role

18   in USSS's U.S. Snowboarding Team's administration, membership, and training.

19   USSS's U.S. Snowboarding Team is approximately twenty-five percent California

20   residents. USSS maintains an official training location at California's Mammoth

21   Mountain. FAC ¶26. USSS routinely sends—not only athletes on the United States

22   Snowboard Team—but athletes from all the national teams USSS exercises control

23   over to this California training location. USSS provides coaches and personnel in

24   support of those teams, not only at the Mammoth Mountain training site, but throughout

25   California. FAC ¶26. USSS deploys personnel—physicians, athletic trainers, physical

26   therapists, psychologists, media professionals, performance analysts, data scientists—

27

28

throughout California to treat, maintain, care for, document, analyze, and assess its world-class athletes during California-based training sessions and competitions.

The support USSS provides its athletes is still not the end of USSS's contacts in California. USSS conducts fundraising activity, sponsors competitions, attends media events, and hosts events throughout California. FAC ¶26. The extent of USSS' contacts with California is clear: USSS conducts itself in such a manner that is essentially at home in this state.  General jurisdiction is warranted.

### 3. The Civil RICO Statute Authorizes Personal Jurisdiction Over USSS

A civil RICO action may proceed in the district court in which one "resides, is found, has an agent, or transacts [] affairs." 18 U.S.C.A. §1965(a). The RICO statute authorizes nationwide service of process. 18 U.S.C.A. §1965(b). The Ninth Circuit has interpreted the RICO service statute and held:

> For nationwide service to be imposed under § 1965(b), the court must have personal jurisdiction over at least one of the participants in the alleged multidistrict conspiracy and the plaintiff must show that there is no other district in which a court will have personal jurisdiction over all of the alleged co-conspirators.

*Butcher's Union Loc. No. 498, United Food & Com. Workers v. SDC Inv.*, 788 F.2d 535, 539 (9th Cir. 1986).

Ninth Circuit district courts have interpreted the *Butcher's Union* ruling and consistently held at least one codefendant must have minimum contacts with the forum, here California:

> that a plaintiff may utilize subsection (b) to establish personal jurisdiction over codefendants only if there is personal jurisdiction — using traditional state-based minimum contact analysis — over at least one defendant. This would require [a defendant] to establish minimum contacts between at least one Defendant and California.

*Bray v. Kendall*, 2010 WL 56181, at *4 (N.D. Cal. Jan. 5, 2010).

USSS also relies on two cases where courts have declined to find jurisdiction that are distinguishable. ECF 81 at 28; *see Abrahamson v. Berkley*, 2016 WL 8673060, at *8 (E.D. Cal. Sept. 2, 2016) (Texas distributor's filing of false tax returns and misrepresentations to federal law enforcement as part of effort to reduce California competitor's national sales to retailers Walgreens, Target, and Big Lots was general, applied nationwide, did not expressly target California, and therefore was insufficient for specific jurisdiction); *see also Krypt v. Ropaar LLC*, 2020 WL 32334, at *8–9 (N.D. Cal. Jan. 2, 2020) (Texas company's hiring of Arkansas employee from California company did not specifically target California, was not expressly aimed at the forum, and could not serve as a basis for specific jurisdiction).

Here, the statute's personal jurisdiction first requires at least one codefendant to have minimum contacts with California. Second, the court must find there is no other district court with personal jurisdiction over all codefendants. *See Butcher's Union*, 788 F.2d at 539. As analyzed, above, this court's personal jurisdiction over USSS is clear. With this court's personal jurisdiction over USSS, the statute's first "ends of justice" jurisdictional requirement is satisfied.

Further, no single district court has personal jurisdiction over Defendants. The District Court for the District of Utah likely has personal jurisdiction over USSS; the District Court for the District of Colorado likely has personal jurisdiction USOPC; and the District Court for the District of Oregon likely has jurisdiction over Foley. Thus, no single district court could assert jurisdiction over all Defendants; the second "ends of justice" requirement for applying RICO's nationwide service of process provision is met; thus this Court has personal jurisdiction over all Defendants.

### 4. <u>Jurisdictional Discovery.</u>

Should the Court doubt otherwise, Plaintiffs request that they be permitted to take focused, jurisdictional discovery. *See In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*, 601 F. Supp. 3d 625, 730 (C.D. Cal. 2022), *opinion clarified sub nom. In*

*re ZF-TRW Airbag Control Units Prod.*, 2022 WL 19425927 (C.D. Cal. Mar. 2, 2022). "Jurisdictional discovery is appropriately granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Id*.

## B. Plaintiffs' Claims Are Timely.

USSS challenges the timeliness of Plaintiffs claims as it addresses each claim but for ease and efficient, Plaintiffs address this issue separately. Plaintiffs' claims are timely under California's Sexual Abuse and Cover-Up Accountability Act (AB-2777) (the "Act"). "A motion to dismiss based on the running of the statute of limitations period may be granted only if the assertions of the complaint, read with the required liberality, would not permit the plaintiff to prove that the statute was tolled." *Supermail Cargo, v. United States*, 68 F.3d 1204, 1206 (9th Cir. 1995).

### 1. Plaintiffs' Sexual Assault Claims Are Timely

This action is timely under the Act, which amended California Civil Procedure § 340, extending the statute of limitations and opening up revival windows for adult survivors of sexual assault and related claims. §340.16 (adult victims); *see also* §340.1 (minor victims). The Act addressed the need for a longer period a survivor can pursue civil recovery. *See* California Bill Analysis, A.B. 2777 Assem., ("The current two-year statute of limitations simply does not provide sexual assault survivors adequate time to heal from the physical and emotional trauma of a sexual assault and prepare for a civil case."). The legislature further explained, "the emotional trauma following sexual assault does not present the same in all survivors and may lead to a delay in seeking medical or legal assistance. The time a survivor needs to process and recover from their assault, enough to engage with the legal system, can take months and even years, certainly longer than the two years currently allowable." *Id.* In fact, § 2 of the Act reads in relevant part:

The Legislature finds and declares as follows:

(g) ***When the perpetrator is someone a victim trusts, it can take years for the victim even to identify what happened to them as a sexual assault***.
(i) Moreover, when these data are combined with widespread news reports of ***major companies being accused of covering up sexual assaults by their employees it is self-evident that statutes of limitation for sexual assault need to be crafted in a way that does not cause the covering-up company to enjoy the fruits of their cover-up*** solely because our statutes of limitation permit, and thus motivate, such behavior.

§ 340.16(Sec. 2)(g,i) (emphasis added).

### a. § 340.16 Revives Plaintiffs' Claims Even if the Sexual Assault Occurred Before January 1, 2009.

USSS contends Plaintiffs' sexual assaults (counts 11–13) are not revived;[10] however, USSS misinterprets §340.16 and its recent amendment because the one-year lookback window for adult sexual assault claims that involved an attempt to cover-up or conceal the sexual assault applies to all cases meeting the criteria of sexual assault regardless of how long ago the abuse occurred. The Act has two facets. The first revives claims seeking to recover damages suffered as a result of a sexual assault that occurred on or after January 1, 2009, and provides a window until December 31, 2026 for doing so. The second—under which Plaintiffs seek relief—provides that:

claim[s] seeking to recover damages suffered as a result of a *sexual assault that occurred on or after the plaintiff's 18th birthday* that would otherwise be barred before January 1, 2023, solely because the applicable statute of limitations has or had expired, *[are] hereby revived, and* a cause of action may proceed if already pending in court on January 1, 2023, or, if not filed by that date, *may be commenced between January 1, 2023, and December 31, 2023.*

§340.16(e)(1) (emphasis added). Thus, the "on or after January 1, 2009" provision does not apply to Plaintiffs who are operating under the "cover-up" provision. Indeed, the California First District Court of Appeal recently held just that, noting "[u]nlike the

---

[10] USSS only challenges Plaintiffs' ability to revive their sexual assault claims, not to meet the elements of sexual assault.

revival provision in §340.16(b)(3), §340.16(e) applies to claims regardless of when the alleged sexual assault occurred." *Doe #21 (S.H.) et al., v. CFR Enter., et al.*, 2023 WL 4783591, at *5 (Cal.Ct.App. June 29, 2023).

Even if sexual abuse occurred decades ago, one can file suit during the limited, one-year window, so long as one or more entities being sued are legally responsible for damages and the entity or their agents attempted to cover-up the abuse. *See id.* The Act defines "cover-up" as any attempt to hide evidence, silence victims or keep the information from becoming public. *See* §340.16(e)(4)(A); *see also* §340.1. USSS cannot hide behind subsection (b) and when subsection (e) created a one-year lookback window with no time bar for when the abuse took place. *See United States v. Flucas*, 22 F.4th 1149, 1164 (9th Cir. 2022), *cert. denied*, 143 S. Ct. 320 (2022) ("[W]e read statutes as a whole, and where Congress includes particular language in one § of a statute but omits it in another, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). That provision responds directly to the #MeToo movement, recognizing the power imbalance present in sexual assaults within the structure of powerful organizations and how those in power use it to silence the victim-survivor.

Because of USSS's active attempts to cover-up Foley's abuse, at least as far back as Rosey's sexual assault in 1994, and the ongoing trauma Plaintiffs suffered, Plaintiffs did not reasonably discover their injuries resulted from the abuse until recently. Accessing the civil justice system allows victim-survivors an opportunity to seek accountability for the years of suffering caused.

**b. Plaintiffs Properly Plead Sexual Assault Under §340.16.**

Under the "cover-up" provision, the Act provides that Plaintiffs must allege three elements: (1) that they were "sexually assaulted"; (2) that "[o]ne or more entities are legally responsible for damages arising out of the sexual assault"; and (3) that "[t]he entity or entities, including, but not limited to, their officers, directors, representatives,

employees, or agents, engaged in a cover-up or attempted a cover-up of a previous instance or allegations of sexual assault by an alleged perpetrator of such abuse." §340.16(e)(2)(A)–(C).

<u>Plaintiffs alleged all three elements</u>. *First*, Plaintiffs were sexually assaulted. "Foley sexually assaulted Rosey when she was just 19 years old when she was invited to and attended a Mammoth Mountain training camp in California during the Spring 1994 season" (FAC ¶85) and "[o]n a separate occasion, Foley sexually assaulted Rosey again. FAC ¶87. "Erin was mentally and verbally abused and sexually assaulted and harassed at USSS- and USOPC-sponsored competitions by Foley who exploited their unequal power dynamic." FAC ¶87. Finally, Callan was raped just feet away from the people who were supposed to protect her. *Id.* ¶130.

*Second*, USSS is legally responsible for damages stemming from the above-described sexual assault. Yet, USSS argues Plaintiffs "fail to allege facts showing that '[o]ne or more entities are legally responsible for damages arising out of the sexual assault.'" Mot. 41. First, USSS does not deny that it is an entity under the Act. *See* Mot. 2. Next, pursuant to the Act, "legally responsible means that the entity or entities are liable under any theory of liability established by statute or common law, including, but not limited to, negligence, intentional torts, and vicarious liability." §340.16(e)(4)(C). Plaintiffs demonstrate USSS is legally responsible through negligence and vicarious liability. *See* FAC ¶¶375, 386, 397.

Particularly, that "USSS . . . breached [its] duty of care" by, *inter alia*, "[f]ailing to protect Plaintiffs from sexual harassment and assault while travelling on behalf of USSS Team; [f]ailing to employ or retain suitable staff to whom it entrusted the care of their young, female athletes; [f]ailing to institute and enforce appropriate policies. . ." and "[f]ailing to investigate complaints of sexual assault and harassment." FAC ¶453. Additionally, Plaintiffs allege that "[a]s a direct and proximate result of the foregoing negligence of USSS [], Plaintiffs were sexually harassed and sexually

assaulted by Foley, other athletes, and USSS- and USOPC-approved coaches at various USSS- and USOPC-sponsored competitions." FAC ¶454. Because of USSS's actions or inactions, Plaintiffs suffered "bodily injuries, pain and suffering, mental anguish, and loss of capacity for the enjoyment of life." *Id.* It follows that not only have Plaintiffs properly stated claims rendering USSS liable for damages arising from their assaults, but it is indeed liable.

*Third*, despite USSS's argument that "Plaintiffs fail to allege facts showing that there was some incident of sexual assault (by Foley or anyone else) that preceded their own alleged assaults," (Mot. 38), Plaintiffs sufficiently allege USSS, including its employees, officers, directors, representatives, or agents "engaged in cover-up or attempted a cover-up of a previous instance or allegations of sexual assault by an alleged perpetrator of such abuse" as required by subsection (e). "[A] previous instance of sexual assault" can be that of a plaintiff's prior assault. Here, USSS, USOPC, and members of the Foley Sexual Abuse and Cover-Up Enterprise ("the Enterprise") engaged in efforts to cover-up their abuse, including but not limited to Foley's first abuse of Rosey in 1994. Moreover, Foley's misconduct was flagrant and since he coached years before Plaintiffs' sexual abuse it is a reasonable inference that other victims exist. Thus, as an entity responsible for the "cover-up," USSS is "legally responsible" for damages arising out of Plaintiffs' injuries.

In a last-ditch effort, USSS contends Plaintiffs must demonstrate USSS knew about the conduct and "engaged in a concerted effort to hide evidence about it." Mot. 38. "'Cover-up' means a concerted effort to hide evidence relating to a sexual assault that incentivizes individuals to remain silent or prevents information relating to a sexual assault from becoming public or being disclosed to the plaintiff, including, but not limited to, the use of nondisclosure agreements or confidentiality agreements." Here, "USSS [] either actually knew or should have known that it was supporting a sexual predator in Foley and benefited from the abuse Foley inflicted on Rosey using

force and coercion to make Rosey engage in sex acts for commercial gain and advantage, in violation of 18 U.S.C. §1591(a)(2)." FAC ¶282. The FAC alleges USSS agents knew or should have known and highlights conduct they engaged in to hide evidence or prevent reporting/investigations. Specifically, Forster turned a blind eye to Foley's ongoing sexual abuse and aided in the toxic Team culture; Pitt provided false reporting information; Kosglow interfered with the ongoing Foley investigation that SafeSport has sanctioned her for; and Goldschmidt discouraged Plaintiffs from reporting, and together, they all engaged in covering-up Foley's abuse. Accordingly, USSS's cover-up activities would remain a fact-bound inquiry incapable of resolution on a motion to dismiss.

### c.   § 340.16 Revives Plaintiffs' Sexual Assault Claims Even if They Did Not Occur in California.

USSS argues Plaintiffs failed to allege sexual assault that occurred in California (*see* Mot. 4); however, the sexual assault need not have occurred in California. Even before this recent amendment, § 340.16 was considered for conduct that occurred outside of California and district court judges have not dismissed on that basis. *See Norwood v. Children & Youth Servs.*, 2011 WL 13130697 (C.D. Cal. 2011) ("Applying the California limitations period would ensure that Plaintiff, an alleged victim of childhood sexual abuse, has the opportunity to have his claims heard on the merits.... California has a legitimate interest in offering a remedy to its residents, even though the alleged abuse did not occur in California.") (citing *McCann v. Foster Wheeler LLC*, 225 P.3d 516, 532 (Cal. 2010) ("A number of prior California cases support the conclusion that California has a legitimate interest in having a statutory provision that affords a remedy for or a benefit to an injured person or business applied when, as here, the injured person or business is a California resident or business, even when the injury-producing conduct occurs outside California."); *see also Doe v. Wilhelmina Models*, 2021 WL 3727097, at *1–*3 (S.D.N.Y. 2021) (finding that a similar look-back statute

in New York *applied because the defendants had enough involvement* in New York even though the plaintiff was not a New York resident and her claim was for sexual abuse that occurred in Mexico) (emphasis added).

Here, Plaintiff Erin is a California resident, and another Plaintiff's assault only occurred in that Nevada hotel room because she had traveled with the Team to USSS-sponsored training camp in Mammoth, California. A defendant cannot escape liability for luring a victim in California merely by moving just over state lines to Nevada to complete the assault.

### d. § 340.16 Revives Not Only Plaintiffs' Sexual Assault Claims, But All Related Claims.

USSS fails to acknowledge that §340.16 also revives Plaintiffs' related claims, not just their sexual assault claims. In particular, operating under the same "cover-up" provision, it reads: "[t]his subdivision *revives any related claims. . . arising out of the sexual assault* that is the basis for a claim pursuant to this subdivision." (emphasis added). Here, Plaintiffs' additional claims: sex trafficking, negligence, negligent supervision/retention, and intentional infliction of emotional distress are all revived as they arise out of Plaintiffs' sexual assaults. *See CFR Enter.*, 2023 WL 4783591, at *5. Plaintiffs' claims are timely and the FAC adequately alleges § 360.16; therefore, dismissal on these grounds cannot be justified.

### 2. <u>Plaintiffs' RICO Claims Are Timely</u>

This action is timely under RICO, 18 U.S.C. §1961 et seq., as the Enterprise fraudulently concealed the ongoing sexual and deceitful activities, torts, and conspiracy taking place within the Enterprise. While a four-year limitations period applies to RICO, the Ninth Circuit has "continuously followed the 'injury discovery' statute of limitations rule for civil RICO claims." *Pincay v. Andrews*, 238 F.3d 1106, 1109 (9th Cir. 2001). Under this rule, "the civil RICO limitations period begins to run when a plaintiff knows or should know of the injury that underlies [her] cause of action." *Id.*

Here, Plaintiffs could not have discovered—and did not discover—the extent of Foley's network's willingness and ability to intervene and cover-up Foley's abuse. Indeed, Plaintiffs trusted SafeSport and individuals within USSS and USOPC when they made their reports. It was not until *after* Plaintiffs' pleas were misdirected, skewed, and left unanswered—which occurred in February 2022 at the earliest—did they discover Foley's conduct was wide and large, which was within the limitations period, and therefore, Plaintiffs' RICO causes of action are timely.

Coupled with damaging their careers, Foley and his co-conspirators targeted his victims' property interest—namely the very causes of action asserted here. As recent as February 2022 Enterprise Member Pitt stifled Plaintiffs' efforts to report the misconduct to the appropriate entities (FAC ¶157(f)); Enterprise Member Kosglow, blatantly interfered with Foley's misconduct investigation, intimidating Plaintiffs from pursuing their SafeSport reports (FAC ¶157(g)); and Goldschmidt discouraged Plaintiffs from reporting their abuse, characterizing the process as so daunting, unethically steering Plaintiffs from reporting and failing to report herself as required (FAC ¶157(h)).

### 3. Alternatively, Plaintiffs Are Entitled to Equitable Estoppel and/or Tolling.

Additionally, any statute of limitations applicable to Plaintiffs' claims, if any, is tolled and USSS is estopped from raising such a defense as USSS's pattern of control, manipulation, cover-ups, and the like deprived Plaintiffs of the opportunity to commence this lawsuit before now, as well as other equitable and other legal bases. USSS's argument that the statute of limitations on Plaintiffs' claims should not be tolled must fail for at least two reasons. First, the Court can dismiss claims at this stage in the litigation on timeliness grounds only if it is beyond doubt that Plaintiffs can prove no set of facts that would establish the timeliness of the claims. Second, assuming the truth of the allegations in Plaintiffs' FAC and drawing all inferences in their favor,

USSS should be equitably estopped from asserting a statute of limitations defense and the statute of limitations should be tolled.

California courts acknowledge "estoppel by duress" applies in the context of sexual abuse. Specifically, a defendant is estopped from raising the statute of limitations defense if (1) the defendant engages in "unconscionable acts" such as threats, intimidation, coercion, or misrepresentations that deter the plaintiff from filing a claim, and (2) the plaintiff establishes she filed the claim "within a reasonable time after the effects of the acts ended." *See Ortega v. Pajaro Valley Unified Sch. Dist.*, 64 Cal. App. 4th 1023, 1048 (1998). In *Doe v. Bakersfield City Sch. Dist.*, 136 Cal. App. 4th 556, 572 (2006), California Court of Appeal recognized a defendant's threats could "still hav[e] a deterrent effect" long after a sexually abusive relationship ends. Moreover, the *Bianco v. Warner* court found that the complaint sufficiently alleged facts that the defendant was equitably estopped from asserting the statute of limitations defense and held that the amended compliant "plausibly state[d] a theory for estoppel and [was] sufficient to survive [the d]efendant's Motion to Dismiss." 562 F. Supp. 3d 526, 534 (C.D. Cal. 2021) ("As a result of Warner's abuse, Plaintiff also allegedly suffers from complex Post-Traumatic Stress Disorder, anxiety, depression, and panic attacks. Given Plaintiff's post-abuse struggles, a jury could also find that Plaintiff filed suit within a reasonable time after the coercive effects of Warner's unconscionable acts ended. [] (legislative history of § 340.16, acknowledging a two-year statute of limitations 'simply does not provide sexual assault survivors adequate time to heal from the physical and emotional trauma of a sexual assault and prepare for a civil case'")); *see Kroll v. Cnty. of Los Angeles*, 2022 WL 2102894, at *2 (C.D. Cal. Apr. 28, 2022) ("It is well settled that a public entity may be estopped from asserting the limitations of the claims statute where its agents or employees have prevented or deterred the filing of a timely claim by some affirmative act.").

**C.**    **Plaintiffs Have Successfully Alleged Valid RICO Violations Upon Which Relief Can Be Granted.**

To state a RICO claim under §1962(c), a plaintiff must allege: (i) conduct (ii) of an enterprise (iii) through a pattern (iv) of racketeering activity, and (v) injury in the plaintiffs' business or property by the conduct constituting the violation. *Sanford v. MemberWorks*, 625 F.3d 550, 557, 559 (9th Cir. 2010). USSS advances four arguments for dismissal, and none carry the day.

**1.**    **USSS conducted and participated in the conduct of the Foley Sexual Abuse & Coverup Enterprise**

USSS's claim that Plaintiffs failed to allege an enterprise and its participation in it is premised on a gross misreading of long-standing precedent. Under 18 U.S.C. §1961(4), an "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *See Odom v. Microsoft Corp.*, 486 F.3d 548 (9th Cir. 2007) ("As is evident from the text, this definition is not very demanding."). This definition includes what is known as an "association-in-fact" enterprise, which requires "three structural features: (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to permit these associates to pursue the enterprise's purpose." *In re WellPoint, Out-of-Network UCR Rates Litig.*, 865 F. Supp. 2d 1002, 1032 (C.D. Cal. 2011). By USSS's own admissions of the close-knit environment between coaches and athletes, Plaintiffs allege more than sufficient facts to support the finding of an association-in-fact enterprise.

First, USSS minimizes the Enterprise's purpose. In a footnote, USSS points to a "wide-ranging and wide-array" of common purposes in a backhand attempt to read in a specificity requirement for alleging a common purpose that simply does not exist. The Enterprise's purpose has always been clear: to enable and cover-up Foley's abuse. Members of the Enterprise took specific actions ("recruit[ed] women and girls to

participate in the sport") with specific motivations ("keep Foley as coach and earn more Olympic medals"). FAC ¶207.

USSS's refusal to understand the clear purpose of the Enterprise and substituting its own is a textbook example of a strawman argument. USSS's entire argument proceeds on the assumption that the common purpose of the Enterprise is "something like 'covering-up Foley's sexual misconduct.'" Mot. 19. In doing so, it ignores part of the purpose was to *enable the misconduct*. *See, e.g.*, FAC ¶207 (describing part of the purpose as "to recruit women and girls to participate in the sport and to allow Foley to engage in illegal sexual activity with the athletes in an effort to keep Foley as coach and earn more Olympic medals, and other financial and reputational benefits"), *id.* ¶216 (describing the "goals and objectives" of the Enterprise as including "facilitat[ing] an environment that permitted or encouraged Foley to continue to be a sexual predator against vulnerable female athletes").

The common purpose of the Enterprise is apparent in the relationships between each member of the Enterprise:

**USOPC and Alan Ashley.** Ashley became a high-ranking executive at USOPC in 2010, after sixteen seasons with USSS, including as Vice-President. FAC ¶222–23. Ashley was close friends with Foley and attended social outings where "Foley would creepily watch young women, Team female athletes included, as they danced, frothing over them, and making crude comments about their bodies to their peers." *Id.* ¶75. While a powerful executive at USOPC, Ashley "knew or should have known about Foley's sexual abuse and had direct knowledge of the major red flags including the toxic culture, the sharing of rooms, and the hyper sexualized environment that included older men and young female athletes." *Id.* ¶223. As with Nassar, Ashley willfully failed enabled and covered-up Foley's continued sexual abuse. *See id.* ¶225.

**Gale "Tiger" Shaw.** Shaw was COO of USSS in 2013 and CEO from 2014–22. *Id.* ¶17. Shaw "knew of the toxic environment Foley created and the allegations against

Foley that eventually became public," *id.*, including that he "became aware that Foley was pressuring young female athletes to take nude and sexually suggestive photos." *Id.* ¶216. Plaintiffs further allege that "Callan made formal complaints to Shaw that she had personal knowledge of multiple instances of Foley's misconduct" and that Shaw failed to act on those complaints. *Id.* ¶176.

**Abbi Nyberg.** Nyberg was a USSS Program Manager who Callan trusted and who learned of Foley's sexual abuse and harassment. *Id.* ¶220. Nyberg traveled with the Team and "knew of the excessive drinking between older male coaches and minor female athletes." *Id.* ¶132. On one occasion, Nyberg told Callan that she could drink alcohol at a Team event even though Callan was underaged. *Id.* ¶133. Nyberg enabled Foley's sexual abuse, and she covered it up by failing to report or intervene.

**Sophie Goldschmidt and Alison Pitt.** Pitt currently is USSS's General Counsel and Goldschmidt is its CEO. *Id.* ¶¶179, 182. When Plaintiffs reported Foley's sexual abuse to Pitt and Goldschmidt, both discouraged them from reporting to SafeSport. *Id.* ¶¶179–83, 219.

**Jeffery Archibald.** Callan reported Foley's misconduct to Archibald, the Team's assistant coach. *Id.* ¶178. Archibald failed to fulfill his reporting duties. *Id.*

**Lisa Kosglow.** Kosglow, a USSS Board member and Foley's personal friend, knew of Foley's misconduct and actively attempted to cover it up by calling and discouraging Rosey and Erin from continuing with their reports. *Id.* ¶¶184–85, ¶218.

**USSS.** Through its executives and staff, who controlled the organization, USSS was aware of Foley's ongoing abuse and took actions to enable and cover it up. Also, USSS was directly responsible for arranging the housing accommodations that resulted in male coaches, like Foley, sharing beds with young female athletes. *See id.* ¶¶60, 61, 73, 85, 163, 231. It was this feature of the Enterprise's operations that most directly enabled Foley's sexual abuse. *See, e.g.*, *id.* ¶¶60–61.

**Foley.** Foley—the abuser—was the pulse of the operation, knew of his own misconduct, and enabled others to cover it up.

Next, USSS argues Plaintiffs failed to show the Enterprise had the requisite "structure or organization." Mot. 21. USSS misstates the law. The "organization" prong does not require the Enterprise to have an "ascertainable structure." *Odom*, 486 F.3d at 551. In fact, the Supreme Court in *Boyle v. United States* described this prong as requiring "relationships among those associated with the enterprise." 556 U.S. 938, 946 (2009). The Court went on to explain that "not much structure is needed" and that "an association-in-fact enterprise is simply a continuing unit that functions with a common purpose." *Id.* at 948. The enterprise in *Boyle* was "loosely and informally organized," did not have "a leader or hierarchy," and lacked "any long-term master plan or agreement." *Id.* at 941; *see also Grijalva v. Kevin Mason, P.A.*, 2020 WL 2562825, at *6 (C.D. Cal. Apr. 10, 2020) (requiring plaintiffs only to allege "a web of relationships among the named Defendants"); *Russell v. Maman*, 2019 WL 13039744, at *3 (N.D. Cal. June 19, 2019) (finding organization where plaintiff alleged "that the associated parties [were] associated informally with each other for the purpose of engaging in a course of conduct"). Members of the enterprise "need not have detailed knowledge of all of the other participants or their activities." *Gilbert v. MoneyMutual, LLC*, 2018 WL 8186605, at *11 (N.D. Cal. Oct. 30, 2018) (citing *United States v. Christensen*, 828 F.3d 763, 780 (9th Cir. 2015)).

Here, "a web of relationships" existed among the members of the Enterprise. *Grijalva*, 2020 WL 2562825, at *6. Given Foley's role as the Team's head coach, each member undeniably interacted with him professionally, and many were his personal friends. *See* FAC ¶¶62, 75, 184. All individual members were in some way affiliated with USSS, which worked closely with USOPC. *See id.* ¶¶36–40.

## 2. **Defendants Engaged in a Pattern of Racketeering.**

Plaintiffs must demonstrate "[a] 'pattern of racketeering activity," which "requires at least two predicate acts of racketeering activity, as defined in 18 U.S.C. §1961(1), within a period of ten years." *Canyon Cnty. v. Syngenta Seeds*, 519 F.3d 969, 972 (9th Cir. 2008). Plaintiffs allege multiple instances of obtaining a victim for the purpose of committing or conspiring to commit sex trafficking in violation of 18 U.S.C. §§1590, 1591, committed by USSS and the Enterprise. Each of the elements are sufficiently alleged in the FAC. Particularly, Plaintiffs alleged instances of recruiting, enticing, transporting, and providing Plaintiffs to Foley; the use of fraud, coercion and deceit to accomplish or attempt to accomplish the sex trafficking; the sex trafficking affected interstate or foreign commerce where the nature of the sport required athletes, coaches, and other Enterprise members to travel domestically and internationally (such as Switzerland); and Foley's sexual assaults were used as a means to coerce and control the athletes for the benefit of USSS and other members of the Enterprise to profit from the success of athletes.

### 3.  <u>The FAC Alleges RICO Injury.</u>

Contrary to USSS's assertions, Plaintiffs' injuries are far from simple personal injuries and are rooted in damage to their business and economic rights. There are at least three bases for the Court to reject USSS's argument. *First*, the FAC contains specific allegations about how the Enterprise, specifically USSS, used deceit and misinformation to steer Plaintiffs away from their right to seek recourse from Foley and others in the Enterprise through litigation or other mechanisms. *See* FAC ¶¶ 94, 111–12, 145–46, 157, 167–89. This direct and intentional interference prevented Plaintiffs from seeking financial recovery and thereby infringed on their economic rights. *See Logan v. Zimmerman Brush*, 455 U.S. 422, 428 (1982) ("a cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause"); *Parker v. Walker*, 6 Cal. Rptr. 2d 908, 912 (Cal. Ct. App. 1992) ("A cause of action to recover money in damages, as well as money recovered in damages, is a …

form of personal property."); *Thomas v. Baca*, 308 Fed. Appx. 87, 88 (9th Cir. 2009) ("California law recognizes a cause of action as a form of property."). Accordingly, Plaintiffs claims are timely.

*Second*, Plaintiffs allege they were injured in their business and property because the RICO scheme humiliated Plaintiffs, bringing them great shame and reputational harm. FAC ¶¶ 94–95, 112–13, 145–46, 259, 261. *Third*, USSS's conduct and participation in the Enterprise directly precluded Plaintiffs ability to maintain business relationships with sponsors—a relationship critical to the performance and livelihood of professional snowboarders. *See* FAC ¶¶ 10, 64, 65, 209, 231(b), 258, 260, 261; *Diaz v. Gates*, 420 F.3d 897, 900–01 (9th Cir. 2005) (finding that "interference with prospective business relations" is an "injury to business or property within the meaning of RICO"); *Guerrero v. Gates*, 442 F.3d 697, 707 (9th Cir. 2006) (finding under *Diaz*, allegations that plaintiff was "unable to pursue gainful employment …. amount[] to intentional interference with contract and interference with prospective business relations, which are torts under California law that constitute injury to business or property under RI"). Plaintiffs were injured by the very objectives of the Enterprise: the scheme to abuse, cover-up, and turn a blind eye to Foley's sexual abuse to preclude Plaintiffs from engaging in the sport whenever they failed to comply with Foley's sexual desires.

USSS wrongly claims this loss of "prospective economic advantage" cannot support a RICO claim. Mot. 30. USSS overstates the standard on a motion to dismiss. As the Ninth Circuit held, "[i]n the RICO context, at the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. *Leonard v. City of Los Angeles*, 208 Fed. Appx. 517, 519 (9th Cir. 2006). A RICO injury need not be quantifiable, *see Potomac Elec. Power v. Elec. Motor Supply*, 262 F.3d 260, 265 (4th Cir. 2001), and "certainty as to

the amount of damages is not required at the pleading stage," *see Alix v. McKinsey*, 23 F.4th 196, 207 (2d Cir. 2022). The fact of an injury is sufficient—further proof is left to the mechanisms of discovery. *Knevelbaard Dairies v. Kraft Foods*, 232 F.3d 979, 991 (9th Cir. 2000) ("Whether experts will be able to measure the [damages] remains to be seen; in deciding a Rule 12(b)(6) motion we are dealing only with the complaint's allegations, which in this instance do not make the claim speculative."); *see Mendoza v. Zirkle Fruit* , 301 F.3d 1163, 1171 (9th Cir. 2002) ("[I]t is important to distinguish between uncertainty in the fact of damage and in the amount of damage.").

### D. <u>Plaintiffs Have Successfully Alleged Valid Sex Trafficking and Forced Labor Violations Upon Which Relief Can Be Granted.</u>

The TVPRA provides a civil cause of action for sex-trafficking victims against those who, like Defendants, participate in a sex-trafficking venture. In the FAC, Plaintiffs bring several claims against USSS under TVPRA including sex trafficking and forced labor under 18 U.S.C. §1595 and conspiracy to commit sex trafficking and forced labor under 18 U.S.C. §1594. As alleged, USSS's knowledge of Foley's sexual predation, its reckless disregard for Foley's conduct, the knowing benefits it received because of Foley's abuse, and its knowing involvement in the conspiratorial scheme to cover-up the misconduct could support a finding that USSS's involvement is violative of TVPRA. Each of USSS's arguments should be rejected as they are squarely refuted by legal authority and the succinct allegations in the complaint.

#### 1. <u>The FAC States a Claim for TVPRA Beneficiary Liability</u>

Under 18 U.S.C. §§1591(a), defendants are liable for sex trafficking if they "(1) knowingly benefited financially or by receiving anything of value (2) by participating in the sex trafficking venture (3) that [the defendants] knew or should have known was a violation of the TVPRA." *J.B. v. G6 Hosp.*, 2020 WL 4901196, at \*8 (N.D. Cal. Aug. 20, 2020). Unlike §1591(a), defendants criminally liable under §1595(a) need only have *constructive knowledge* that the venture in which they participated was engaging

1  in sex trafficking. *See Does 1-6 v. Reddit*, 51 F.4th 1137, 1141 (9th Cir. 2022). In the
2  FAC, Plaintiffs satisfy these elements.

3      USSS grossly understates the allegations in the FAC with a blanket statement
4  that "no such violation of § 1589 (criminal forced labor) or § 1591 (criminal sex
5  trafficking) is alleged." Mot. 34–35. This generic assertion is undermined by the
6  allegations in the FAC alleging Defendants violated criminal forced labor and criminal
7  sex trafficking laws by making success in snowboarding contingent on Plaintiffs'
8  compliance with Foley's control.

9      USSS's primary contention is that Plaintiffs "have not plausibly alleged facts
10 showing that USSS knew or recklessly disregarded the alleged fact that they were
11 abused by Foley." Mot. 36. To support this improbable position, USSS relies on a case
12 from Kansas with facts largely distinct from those here. There, the court held because
13 "plaintiff did not allege that she ever notified USTA about Couch Haultain's conduct
14 and did not allege that anyone employed by USTA witnessed Coach Haultain's
15 conduct" or, most critically, "[p]laintiff did not even allege that USTA *generally* was
16 aware of sexual abuse occurring within USTA." *Jensen v. United States Tennis Ass'n*,
17 2021 WL 1226625, at *1 (D. Kan. Apr. 1, 2021). *Jansen* is factually distinguishable
18 from the instant case. Not only has each Plaintiff alleged USSS was directly aware of
19 the misconduct through their reporting [FAC ¶¶176–84], but Plaintiffs have also
20 sufficiently alleged that USSS should have known of the trafficking venture based on
21 the clear and long-running culture permeated by sexual abuse and assault.

22     Particularly, the FAC is replete with allegations supporting this finding such as
23 the history and culture of underage drinking [FAC ¶¶129, 132], sharing bedrooms with
24 male and female coaches and athletes [FAC ¶¶60–61, 73, 163, 231(f)], sexual abuse
25 and violence [FAC ¶¶160–62], sexually motivated "jokes" [FAC ¶¶78, 78, 122, 160–
26 64]. Indeed, the FAC alleges that certain USSS personnel were present and/or
27 personally involved in contributing to the sexual abuse and harassment culture. FAC

28

¶85 (USSS coach Foley assaults Rosey); FAC ¶90 (USSS coach Foley taunts Rosey at an event years later); FAC ¶¶99–101 (USSS coach Foley comments on 15-year old Erin's body weight); FAC ¶103 (USSS coach Foley forcibly gropes and attempts to kiss Erin in the presence of USSS personnel); FAC ¶118 (USSS coach Foley whispers to 14-year old Callan that he wanted to "put [his] tongue inside her pussy" referencing a younger girl on the dance floor); FAC ¶¶124–25 (USSS controlled athletes travel and lodging enabling athletes to share rooms during travel); FAC ¶129 (USSS "chaperones" including Jon Casson and Enterprise Member Nyberg knew of underaged drinking amongst athletes); FAC ¶132 (Nyberg knew of excessive drinking between older male coaches and minor female athletes); FAC ¶133 (Nyberg explicitly told Callan she could drink alcohol); FAC ¶165 (toxic culture was obvious to everyone who oversaw the Team); FAC ¶176–78 (multiple direct and formal complaints to USSS employees and executives). It is without question USSS clearly knew about their pervasive conduct.

These allegations support finding USSS participated in the sex-trafficking by providing Foley with the access, platform, and tools to facilitate trafficking female athletes, and by willfully concealing the venture so that it could persist for years. The relationship between Foley and USSS is continuous, sustained, and significant and the facts set forth in the FAC are sufficient to support a finding that Defendants were actively participating in the sex-trafficking venture.

"Participation in a venture" under §1595 includes "a showing of a continuous business relationship between the trafficker and the [defendant] such that it would appear that the trafficker and the [defendant] have established a pattern of conduct or could be said to have a tacit agreement." *J.B.*, 2020 WL 4901196, at *9; s*ee also J.M. v. Choice Hotels Int'l,* , 2022 WL 10626493, at *4 (E.D. Cal. Oct. 18, 2022) (finding the "participation in a venture" element satisfied by proof that a hotel franchisor directly rented rooms to plaintiff's sex traffickers through their control of the hotel

booking and payment system). The allegations in the FAC support a finding that USSS gave Foley the tools to traffic young athletes who trusted him and sought guidance from him; legal precedence supports this conclusion. *See Doe v. Mindgeek USA*, 558 F.Supp.3d 828, 838 (C.D. Cal. 2021) (finding "the FAC contains sufficient facts to make it plausible that Defendants were aware of [violations of TVPA]" where Plaintiff alleged that Defendants "reviewed, approved, and uploaded [violative content]," and Defendants failed to adequately monitor its platform).

Moreover, Plaintiffs have adequately alleged that USSS benefitted from its participation in the sex-trafficking venture. USSS benefitted from the retention of award-winning athletes. FAC ¶¶207, 210–14. Indeed, Plaintiffs collectively have several professional medals between them and USSS directly benefitted in money and accolades when Plaintiffs continued in the sport and benefitted from Foley coaching. Thus, USSS despite its history, culture, and propensity for permitting a sexually violent and harassing environment benefitted from keeping both.

## 2. The FAC sufficiently Alleged a Cause of Action For Conspiracy to Commit Sex Trafficking Under the TVPRA.

Likewise, Plaintiffs have adequately alleged a conspiracy to commit sex trafficking under 18 USC §§1594(c), 1595(a). Under 18 U.S.C. §1594, "anyone who conspires with another to violate § 1951" is criminally liable for conspiracy to commit sex trafficking. To prove the existence of a conspiracy, plaintiffs must show a "meeting of the minds in an unlawful arrangement." The agreement does not need to be an agreement to engage in sex trafficking but can be an agreement to financially benefit from sex trafficking. *Fleites v. MindGeek S.A.R.L.*, 617 F. Supp. 3d 1146, 1163 (C.D. Cal. 2022). Such an agreement can be inferred based on the knowledge and conduct of the parties. *Id.* ("Visa's agreement to financially benefit from child porn can be inferred from its decision to continue to recognize MindGeek as a merchant despite allegedly

knowing that MindGeek monetized a substantial amount of child porn on its websites.").

There is a strong inference USSS knew its success was rooted in the strength of the athletes complying with Foley's acts. USSS argues the FAC fails to allege that it conspired to commit violations of the TVPRA. FAC does precisely that in detail. *See* FAC ¶¶48–58, 156–241. For example, the FAC specifically alleges that the Enterprise "had the common purpose of preventing (or attempting to prevent) the reporting, prosecution, or disclosure of Foley's sexual abuse, sexual assault, mental abuse, and exploitative or retaliatory behavior." FAC ¶200. Also, USSS "shared the common purpose of covering-up Foley's sexual abuse." FAC ¶201. Additionally, the FAC alleges USSS and others took efforts to protect Foley by "stifl[ing] reporting so that Foley could continue to be protected at the peril of athletes" (FAC ¶204) plus, "intervening in Plaintiffs' efforts to report the sexual assault and harassment they witnessed and endured" (FAC ¶214); and "us[ing] false pretenses to prevent individual Plaintiffs from reporting Foley's sexual misconduct" (FAC ¶215); purposely failing to report sexual misconduct directly reported to it (FAC ¶223); and convening a Team athlete meeting to corral support for Foley. FAC ¶226.

### E.   Plaintiffs Have Successfully Alleged Common Law Claims.

#### 1.   Negligence is Properly Maintained

While USSS essentially concedes that it has a special relationship with Foley, it argues it owed no duty of care to Plaintiffs because (1) Foley's abuse was not foreseeable, and (2) Callan—a minor traveling internationally with USSS—was not in USSS custody when she was assaulted.[11]  The Court should reject both arguments.

When the defendant has a special relationship with either the dangerous third party or the victim-plaintiff there is a duty to prevent or warn of dangerous conduct.

---

[11] USSS also argues the negligence claims are time barred. As explained in §B above, Plaintiffs' claims are not time barred, as they have been revived by the Act and the limitations period has been tolled.

*Regents of Univ. of California v. Superior Ct.*, 4 Cal. 5th 607, 619 (2018) (holding that a university had a special relationship with students and, thus, had a duty of care to protect them from foreseeable harm during curricular activities).[12] Here, USSS had a special relationship with Foley, who it paid and supervised, and with athletes.

Where a special relationship is found, a court can limit that duty only if, applying the factors outlined in *Rowland v. Christian*, 69 Cal. 2d 108 (1968), it determines that public policy weighs against holding the defendant culpable. *See Brown v. USA Taekwondo*, 11 Cal. 5th 204, 209 (2021). Here, Plaintiffs plead that USSS has a special relationship with Plaintiffs and with Foley and owed a duty to protect Plaintiffs from Foley's entirely foreseeable abuse. Further, Callan pleads that she was in USSS custody when she was assaulted at a USSS-sponsored event.

### a. USSS Had a Special Relationship with Plaintiffs and/or Foley, Whose Conduct Was Foreseeable.

USSS owed a duty to protect Plaintiffs from Foley's abuse because they had a special relationship with Plaintiffs and Foley, and Foley's conduct was foreseeable.

A special relationship exists where the plaintiff relies and depends on the defendant such that they have a right to expect the defendant's protection. *Regents*, 4 Cal. 5th at 619. In *Regents*, the California Supreme Court discussed the common hallmarks of a special relationship, explaining that, "[g]enerally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection." *Id.* at 620. The Court further explained, "[t]he corollary of dependence in a special relationship is control. Whereas one party is dependent, the other has superior control over the means of protection..." and that "a typical setting for the recognition

---

[12] As USSS notes, there is no conflict in negligence law between the various states that may have interests in Plaintiffs' claims, thus the Court need not engage in further choice-of-law analysis. *See* Mot. 44 ("California uses the 'governmental interest' choice-of-law analysis, which requires: (1) determining whether the states have different laws; (b) [sic] if so, examining whether each jurisdiction has an interest in applying its own law; and (c) [sic] evaluate and compare the nature and strength of each jurisdiction's interest.").

of a special relationship is where the plaintiff is particularly vulnerable and dependent upon the defendant who, correspondingly, has some control over the plaintiff's welfare." *Id.* at 621. Lastly, the Court noted "many special relationships especially benefit the party charged with a duty of care." *Id.* Applying this, the *Regents* Court held a university had a special relationship with its students because the students were "dependent on their college communities to provide structure, guidance, and a safe learning environment" and that universities "have superior control over the environment and the ability to protect students." *Id.* at 625.

Here, the FAC alleges that young female snowboarders were vulnerable and reliant on coaches and staff who had outsized control over their lives and wellbeing. FAC ¶2 ("[a]thletes, especially elite athletes, are uniquely vulnerable to abuse because, among other things, athletes want and need the approval of their coaches."); *id.* ("[c]oaches are the gatekeepers to an athlete's success and have tremendous power over an athlete's future. Founding coaches of a sport, as is Foley to snowboarding, yield a level of power that can be career ending for an athlete if they do not comply with the coach's demands."); *id.* ¶51 ("The vulnerability of young athletes aspiring to be Olympians has been widely documented. . .USOPC fosters a culture of fear in which child athletes are conditioned to never question adults. If we didn't weigh what they wanted, eat what they wanted, look the way they wanted, then they could take our spot away…. We were kids. That's all we knew. We didn't know it could be any different."). USSS controlled the travel, lodging, and meal stipends for athletes traveling with the Team. *Id.* ¶123. USSS also reaped significant benefit from the hard work and talent of athletes competing for the Team. *Id.* ¶¶39, 41, 213. These athletes, thus, had a right to expect protection from USSS.

The duty to protect from dangerous third parties arises where a defendant has a special relationship with that third party. Courts have already considered an NGB's duty to protect young athletes from sexually predatory coaches. In *Brown v. USA*

1    *Taekwondo*, the Court of Appeal held that USA Taekwondo ("USAT") had a special
2    relationship with a coach who sexually abused the plaintiff-athletes during his tenure
3    with the team. 40 Cal. App. 5th 1077, 1094 (2019) *aff'd*, 11 Cal. 5th 204 (2021). The
4    court described, "[t]he key in each [special relationship] is that the defendant's
5    relationship with ... the tortfeasor ... places the defendant in the best position to protect
6    against the risk of harm.... Thus, the defendant's ability to control the person who
7    caused the harm must be such that if exercised, [it] would meaningfully reduce the risk
8    of the harm that actually occurred." *Id.* at 1092.

9        USSS was in the best position to protect Plaintiffs from Foley. *See Brown*, 40
10   Cal. App. 5th at 1092. In holding that USAT owed a duty to protect athletes from a
11   coach's abuse, the Court of Appeal in *Brown* noted that USAT adopted codes of
12   conduct and ethics that prohibited "among other things, provision of alcohol to youth
13   athletes, inappropriate touching between a coach and an athlete, and nonconsensual
14   physical contact" and that "USAT can, and did, enforce its policies and procedures by
15   temporarily suspending [the coach]... and terminating [his] USAT membership." *Id.* at
16   1094. The court concluded that "USAT was therefore in the best position to protect
17   against the risk of harm and meaningfully reduce the risk of the harm. . ." *Id.*

18       Here, like USAT, USSS adopted a Code of Conduct which prohibits "illegal or
19   immoderate use of alcohol," any use of alcohol by minors, any conduct "that could be
20   perceived as harassment based upon gender," and the commission of a criminal act.
21   *See* FAC ¶452. USSS also required minors to sign a contract agreeing to not consume
22   alcohol while traveling with the Team. *See id.* ¶451. But they did not enforce those
23   rules. USSS controlled travel and could have implemented safeguards against co-ed
24   bed sharing. *See id.* ¶¶ 60, 124. Like USAT, USSS was "in the best position to protect
25   against the risk of harm and meaningfully reduce the risk of the harm." *See Brown*, 40
26   Cal. App. 5th at 1094.

27

28

1    USSS argues Foley's conduct was not foreseeable because it was not aware of
2    precise instances of assaults prior to March 2022. *See* Mot. 45. However, this is not the
3    standard for foreseeability or for establishing a special relationship. In *Brown*, the
4    plaintiffs did not allege reports of specific misconduct by the coach that abused them.
5    40 Cal. App. 5th at 1097. Rather, they alleged that USAT had general knowledge of
6    the propensity for sexual abuse of athletes by coaches in Olympic sports and, thus,
7    "[b]ased on these allegations, it was foreseeable youth athletes attending Olympic
8    qualifying competitions with their coaches might be sexually molested by their
9    coaches, *regardless of whether USAT had knowledge of prior sexual misconduct by*
10   *Gitelman*." *Id.* at 1097–98 (emphasis added).

11       The Court of Appeal in *Brown* court further cited  *Doe v. United States Youth*
12   *Soccer*, 8 Cal.App.5th 1118, 1132–35 (2017), which held that "even though soccer
13   associations were not aware of coach's prior sexual abuse, sexual abuse of minors in
14   soccer program by their coach was reasonably foreseeable because the associations
15   'were aware that sexual predators were drawn to their organization in order to exploit
16   children and that there had been prior incidents of sexual abuse of children in their
17   programs,'" and *Juarez v. Boy Scouts of America*, 81 Cal.App.4th 377, 404 (2000)
18   (overruled on other grounds), which found that "it should be reasonably foreseeable to
19   the Scouts that a child participating in scouting might fall prey to a sexual predator,
20   with no documented history of such proclivities, who is serving as an adult volunteer
21   in the child's scouting troop." *Brown*, 40 Cal. App. 5th at 1098.

22       Likewise, USSS had knowledge of the propensity for sexual abuse common to
23   Olympic sports. *See* FAC ¶44 (describing the fallout of the Nassar scandal and
24   USOPC's subsequent commissioning of the Ropes & Gray Report), ¶46 (describing a
25   sexual abuse handbook proposed by several NGBs in 2011), ¶¶55–58 (describing a
26   widespread culture and power structure leading to systematic and known abuse in
27   Olympic sports). Further, Plaintiffs allege that USSS had specific knowledge of Foleys
28

predatory behavior and the dangerous conditions in which USSS athletes were placed. Specifically, Plaintiffs indicate that, "Foley's predatory behavior was constant and well known to members, executives, agents, and associates of the Team, USSS, and USOPC," that "Foley's abuse was reported to executives of USSS and USOPC on numerous occasions by multiple athletes," that USSS was aware that, "[a]t Foley's direction, female and male athletes and employees were routinely forced to share rooms. . . and even beds. . .," that USSS officials, like Forester and Ashley, were present when Foley made creepy and sexually explicit comments about young athletes, that USSS officials, like Nyberg, allowed and encouraged minor athletes to drink excessively with adult coaches and athletes, that USSS coaches regularly engaged in behavior like stealing the bras of female athletes, slapping their butts, and, on one occasion, licking barbeque sauce off a female athlete's chest during a public meal, and, ultimately, that "no one even tangentially related to USSS, USOPC, or the Team could have escaped knowledge of the toxic and sexually explicit nature of its culture." *See* FAC ¶¶8, 60, 75, 222, 133, 234, 162–164.

Thus, USSS's attempt to cite *Brown* for the proposition that "unforeseeability of the kind of harm" alleged may counsel against maintaining liability is unavailing. *See* Mot. 45–46. USSS's further citation to *Sanchez ex rel. Sanchez v. Wal-Mart Stores*, 125 Nev. 818, 824 (2009) for the same proposition cannot negate the on-point holding in *Brown*. *See id.* The *Sanchez* court found no special relationship existed between a pharmacy and a motorist injured by a patient driving under the influence of drugs obtained at the pharmacy. *Sanchez*, 125 Nev. 818 at 824. Thus, the court never reached the analysis of whether foreseeability factors counseled against maintaining special relationship liability. *Id.* Ultimately, just as was the case in *Brown*, based on the facts alleged in the FAC, it was foreseeable that young athletes traveling with USSS might be sexually abused by their coaches, *regardless* of whether USSS had prior knowledge

of Foley's misconduct (though, again, Plaintiffs allege it did).[13] *See Brown*, 40 Cal. App. 5th at 1097–98.

### b. Plaintiff Callan Pleads She Was in USSS Custody When She Was Assaulted at a USSS Sponsored Event.

USSS contends Plaintiff Callan "does not allege any facts suggesting that she was in the in the custody of USSS at the time of the assault or that the event somehow tied to USSS." Mot. 46. This is flatly untrue. Callan alleges that, when she was 16 years old, she traveled with USSS to attend a Junior World Championship event as a part of USSS Team. FAC ¶128. While at this event, she was encouraged to attend a large party where "adults entrusted with her care," *i.e.*, USSS coaches and staff chaperoning her at this international tournament and provided significant alcohol. FAC ¶¶128–29. Callan further alleges that her present adult chaperones, including Casson and Nyberg, did nothing to protect her from the alcohol fueled party that lead to Callan's assault. FAC ¶¶129, 131. While traveling with USSS, the organization was in control of athletes' travel, lodging, and meals. FAC ¶124. As a minor, Callan depended on USSS to provide a safe environment while she travelled to and attended competitions on behalf of USSS. FAC ¶124. Callan sufficiently alleges that she was in USSS custody while traveling with USSS, to compete for USSS Team, staying in USSS arranged lodging, and attending USSS-sponsored events—including social events encouraged and patroned by USSS coaches and staff during such travel.

---

[13] USSS is additionally negligent because it knowingly placed Plaintiffs in foreseeably dangerous situations—like alcohol fueled and sexually charged parties and co-ed hotel beds—with Foley and other bad actors, thus, exposing them to the risk of the exact abuse they suffered. *See Doe 1 v. Deutsche Bank Aktiengesellschaft*,, 2023 WL 3167633, at *16 (S.D.N.Y. May 1, 2023) (citing Restatement (Third) of Torts: Phys. & Emot. Harm § 19 (2010)) ("The conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of the plaintiff or a third party. . . . If the third party's misconduct is among the risks making the defendant's conduct negligent, then ordinarily plaintiff's harm will be within the defendant's scope of liability.").

1    USSS cites *Young v. Salt Lake City Sch. Dist.*, 52 P.3d 1230, 1233 (Utah 2002)

2   and *Boy 1 v. Boy Scouts of Am.*, 832 F. Supp. 2d 1282, 1289 (W.D. Wash. 2011)[14] to

3   illustrate cases where an organization did not have custody of injured children and,

4   thus, had no duty to protect them. *See* Mot. 46–47. Neither case applies to the facts

5   here. In *Young*, the court found a school did not have custody of a child after school

6   was adjourned for the day, the child was released into the care of his parents and was

7   then injured in a public crosswalk over which the school had no control. *See Young*, 52

8   P.3d at 1233–34. In *Boy 1*, the court recognized that plaintiffs could have been in the

9   Boy Scouts' custody during "over-night outings, camping events, and trips away from

10  parents," however, plaintiffs failed to make any direct allegations that they were injured

11  during one of these trips. 832 F. Supp. 2d at 1289. In contrast, Callan directly alleges

12  that she was traveling with USSS, away from her parents, and under USSS's care and

13  control when she was attacked during this trip. *See* FAC ¶¶124–34. Further, USSS had

14  control over Callan's lodging and activities while she traveled with the Team and, thus,

15  could have implemented several safety procedures to keep minor athletes like Callan

16  from dangerous alcohol fueled parties with adult coaches. *See* FAC ¶24; *see also*

17  *Brown*, 40 Cal. App. 5th at 1095 ("USAT could have taken additional steps to protect

18  youth athletes by prohibiting coaches from traveling alone to competitions with youth

19  athletes, barring coaches from staying in hotel rooms at competitions with youth

20  athletes, and providing guards or chaperones at hotels and dormitories at competitions

21  to prevent improper conduct by coaches.")

22    Lastly, USSS presents the Court with Swiss legal concepts and argues Callan

23  fails to state a claim, should that law apply. However, USSS fails to present any

24  analysis on why Switzerland's interest in applying its own law would prevail over other

25  state laws identified. *See* Mot. 47–48; *cf. Wilhelmina Models*, 2021 WL 3727097 at

---

27  [14] Again, with no conflict of law between the various states, the Court need not engage
28  in further conflict of law analysis. *See* Mot. 46.

1   *1–*3 (applying New York law to sexual abuse claims that occurred in Mexico).

2   Regardless, USSS misstates Swiss law on secondary tort liability.

3    USSS cites *Kashef v. BNP Paribas SA*, 2021 WL 603290, at *2 (S.D.N.Y. Feb.

4   16, 2021) for the proposition that, under Swiss law, to establish secondary tort liability,

5   "a plaintiff must allege '(1) a main perpetrator committed an illicit act, (2) the

6   accomplice consciously assisted the perpetrator and knew or should have known that

7   he was contributing to an illicit act, and (3) their culpable cooperation was the natural

8   and adequate cause of the plaintiff's harm or loss.'" Mot. 47. USSS ignores the *Kashef*

9   court's explanation that a defendant's negligence is sufficient to meet the second

10  element of "conscious assistance." *Id.* ("each perpetrator must have known *or been*

11  *capable of knowing, when exercising due care, that the others were involved in the*

12  *harmful act*.") (emphasis in original). Even if the Court were to apply Swiss law, Callan

13  sufficiently alleges that USSS's lack of proper safety procedures "set the stage for the

14  assault to occur." FAC ¶131. If USSS had exercised due care while traveling

15  internationally with minors—including providing competent chaperones, enforcing

16  policies against underaged drinking, monitoring safe athlete lodging, and merely

17  refraining from encouraging minors to attend alcohol fueled and sexually charged

18  social gatherings with adults—it would have been capable of knowing that Callan was

19  being whisked away from a USSS event by another malicious adult.

20    **2.** **<u>Defendants Clearly Engaged in Negligent Supervision and</u>**

21      **<u>Retention.</u>**

22   Plaintiffs' claims for negligent supervision and retention are properly

23  maintained. USSS first argues Callan is an improper Plaintiff to the negligent

24  supervision claim because she does not allege she was injured by Foley. *See* Mot. 49.

25  USSS next argues it cannot be liable for negligent supervision and retention because it

26  had no knowledge of Foley's perversions. USSS ignores Plaintiffs' well pled

27  allegations on each point.

28

### a.  Foley Injured Callan.

USSS agrees that a plaintiff properly establishes a claim for negligent supervision and retention where the plaintiff is "allegedly injured by the purportedly negligently-supervised employee." *Id.* (citing *Love v. Motion Indus.*, 309 F. Supp. 2d 1128, 1138 (N.D. Cal. 2004)). Yet, USSS argues because Callan does not allege she was sexually assaulted by Foley, that she does not allege an injury from Foley and, thus, her claim should be dismissed. This flies in the face of the instances in the FAC that Callan suffered injury and harm due to Foley's abuse and harassment. Specifically, Foley exploited their unequal power and exposed Callan to sexual and racial harassment—including conduct like whispering in, then 14 year old, Callan's ear that he wanted to "put [his] tongue inside her pussy" while pointing at another woman at a Team outing, brazenly taking nude photos of Callan's female teammates, encouraging sexually violent "joking" by other athletes and coaches, and routinely talking about his own sex life and pornography habits in front of minor athletes. *See* FAC ¶¶117–23.

Callan further alleges that she suffered through years of turmoil due to Foley's harassment and intimidation, extending throughout her competitive and coaching career. *See* FAC ¶¶135–45. Specifically, Callan "became ridden with anxiety from the toxic environment and Foley's abuse," and when she made efforts to protect and distance herself from Foley, she "was singled out, stopped receiving adequate coaching from Foley," and suffered financial retaliation. FAC ¶¶135–38. Ultimately, "Callan's lack of trust in her coach severely affected her mental health and her athletic performance." FAC ¶140. The plain allegations of the FAC clearly set forth Callan's injuries at Foley's hands. She is a proper plaintiff to a negligent supervision and retention claim. *See Love*, 309 F. Supp. 2d at 1138.

### b. USSS Knew or Should Have Known of Foley's Propensity for Abuse.

1    USSS knew or should have known that Foley had a propensity to assault, harass,

2    and harm Plaintiffs. Indeed, the circumstances surrounding the team culture that was

3    widely known across the world, were foreseeably likely to lead to Plaintiffs' harm. *See*

4    FAC ¶234.

5    USSS relies on *Devine v. Great Divide Ins.*, 350 P.3d 782, 792 (Ala. 2015) for

6    the proposition that a plaintiff must establish that a supervisor, "had foreknowledge of

7    [the employee's] propensity for violence and his animosity toward [the victim] or . . .

8    [the employer] knew that [the employee] was reasonably likely to assault [the victim],"

9    in order to have a cognizable claim for negligent supervision. *See* Mot. 50. Detrimental

10   to its argument, USSS misstates *Devine*'s reach. The quoted portion of *Devine*

11   discusses fact-specific issues surrounding more specific knowledge required for a

12   failure to warn element not appliable or dispositive here. 350 P.3d at 792. Further, the

13   standard for negligent supervision changes where, as here, Defendants had a special

14   relationship with Plaintiffs and/or Foley. *See Jennifer C. v. Los Angeles Unified Sch.*,

15   168 Cal. App. 4th 1320, 1329 (2008).

16   In *Jennifer C.*, a minor with special needs was sexually assaulted at school in a

17   secluded alcove that the school administration knew existed. Where a special

18   relationship exists, "[a] court's task in determining whether there should be a duty, *vel*

19   *non*, . . . is not to decide whether a particular plaintiff's injury was reasonably

20   foreseeable in light of a particular defendant's conduct but rather to evaluate more

21   generally whether the category of negligent conduct at issue is sufficiently likely to

22   result in the kind of harm experienced that liability may appropriately be imposed on

23   the negligent party." *Jennifer C.*, 168 Cal. App. 4th at 1329. Applying this standard,

24   the court found that, "[i]n the present circumstances, a modicum of foresight shows a

25   probability of victimization." *Id.*[15]

26

27   [15] Again, as USSS points out, there is no material difference in negligence law between
     that various states with potential interests and, thus, the Court need not engage in
28   further choice of law analysis. *See* Mot. 49.

Likewise, a mere "*modicum* of foresight" by USSS would have shown that allowing adult male coaches and athletes to sleep in the same beds as young, sometimes minor, female athletes and fostering a culture of excess drinking and boisterous sexual commentary were sufficiently likely to lead to the exact kind of abuse and harassment Plaintiffs suffered. *See Jennifer C.*, 168 Cal. App. 4th at 1329; *see also D.Z. v. Los Angeles Unified Sch.*, 35 Cal. App. 5th 210, 229 (2019) ("It is not necessary to prove that the very injury which occurred must have been foreseeable... [N]egligence is established if a reasonably prudent person would foresee that injuries of the same general type would be likely to happen in the absence of [adequate] safeguards.").

As alleged in the FAC, USSS controlled, allowed, and maintained these unsafe travel, lodging, and cultural conditions and, thus, was aware of their danger. *See* FAC ¶124. USSS was not only aware of but created these travel conditions and Team culture engaged in at USSS-sponsored events. *See* FAC ¶¶124–125, 131. USSS was aware of this conduct through executives like Ashley, Nyberg, and Shaw. *See Mountain Copper v. Welcome Growers Gin*, 197 Cal. App. 2d 253, 256 (Ct. App. 1961) ("Knowledge acquired by an agent while acting within the course and scope of his employment is chargeable to his principal, his employer.").

The notion that USSS—or any of its employees—was unaware of the Team culture, permeated with sexual violence and harassment, is contradicted by the facts alleged in the FAC and accepted as true. In fact, before being disgraced and terminated as the Chief of Sport Performance for USOPC for his role in enabling and concealing abuse by team doctor, Nassar, Ashley spent more than a decade as a USSS executive, rising to the role of Vice President. FAC ¶¶222–25. Ashley had a close relationship with Foley, often attending bars and social outings with Foley and athletes. *Id.* ¶222. Thus, as alleged, "Ashley knew or should have known about Foley's sexual abuse and had direct knowledge of the major red flags including the toxic culture, the sharing of rooms, and the hyper sexualized environment that included older men and young

female athletes from his time at USSS and USOPC." *Id.* ¶223. Ashley became aware of these toxic conditions while acting in the scope of his roles as an executive for USSS and, thus, that knowledge was imputed to the organization. *See Mountain*, 197 Cal. App. 2d at 256.

Similarly, Shaw spent over a decade deeply emersed in USSS's toxic culture, eventually serving as the President and CEO of USSS from March 2014 to March 2020. FAC ¶¶17, 157. In fact, "[a]t the very least, Plaintiff Callan reported Foley's misconduct to Shaw before the media became aware of the allegations." *Id.* ¶¶17, 176. All of Shaw's knowledge was gained while he acted in the scope of his employment with USSS and, thus, this knowledge was imputed to the organization. *See Mountain*, 197 Cal. App. 2d at 256. Shaw had the opportunity and power to report this abuse, sanction Foley, and to implement safer procedures for co-ed traveling. *See* FAC ¶176. He simply failed to exercise it. *See id*.

Enterprise Member, Nyberg, was intimately aware of the Team's unsafe travel conditions and toxic culture. *See* FAC ¶¶8, 129, 132–33, 177, 220. Nyberg traveled with the Team and had personal knowledge of widespread excessive drinking between minor athletes and adult coaches. *See id.* ¶132. Nyberg went as far as personally condoning Callan's underaged drinking at a Junior World Championship competition because, "everyone... knew that the Team encouraged heavy underaged drinking" despite the "supposedly strict prohibition" on such conduct. *Id.* ¶133. Nyberg was present with USSS Team and knew of the heavy partying between adult coaches and minor athletes, at the competition where Plaintiff Callan was assaulted by an adult coach who preyed on her at just such a party. *Id.* ¶132. Again, Nyberg's knowledge was acquired while she acted in the scope of her employment with USSS. The knowledge was, thus, imputed to USSS. *See Mountain*, 197 Cal. App. 2d at 256.

USSS knew, or should have known, of its unsafe travel conditions and toxic culture. USSS knew, or should have known, of Foley's perverse proclivities and

1  abusive conduct. Any reasonable adult should know that placing minors and other
2  young athletes in the same hotel beds as their adult male coaches and teammates could
3  lead to sexual abuse. Adding into a well-known Team culture of drinking and
4  hypersexual conversation makes a failure to recognize this danger even more absurd.
5  Even under USSS's inapplicable standard, its contentions still fail. Contrary to its
6  claims, Plaintiffs show USSS did in fact have specific knowledge of Foley's abuse and
7  the Team's abusive culture. FAC ¶¶17, 103, 157, 175–76, 223. Even with this
8  knowledge, USSS still failed to exercise even "a modicum of foresight" that the grossly
9  unsafe conditions could lead to abuse and, in turn, failed to implement reasonable
10  safeguards for the young athletes traveling and competing in their care.

11  ### 3.  **Intentional Infliction of Emotional Distress.**

12  USSS also contests Plaintiffs' claims against them for intentional infliction of
13  emotional distress ("IIED"). USSS argues (1) its conduct was not extreme and
14  outrageous, and (2) a failure to act is insufficient to support a claim for IIED. The
15  allegations in the FAC are more than sufficient to state a claim for IIED.

16  The elements of IIED are (1) extreme and outrageous conduct; (2) the intent to
17  cause, or the disregard of a substantial likelihood of causing, severe emotional distress;
18  (3) causation; and (4) severe emotional distress." *Hughes v. Pair*, 46 Cal. 4th 1035,
19  1050 (2009). USSS' conduct in facilitating and concealing Defendants' trafficking,
20  along with the overt cover-up of Foley's sexual abuse, was extreme and outrageous,
21  and caused Plaintiffs severe emotional distress.

22  USSS argues its behavior was not outrageous because it was not "so extreme as
23  to exceed all bounds of that usually tolerated in a civilized community." *Id.* However,
24  in a complaint nearing almost 500 paragraphs, there is an extensive outline of extreme
25  and outrageous conduct that caused Plaintiffs emotional distress—namely, the efforts
26  to further a long running sex-trafficking scheme and assistance in covering it up.
27  Outrageous behavior is also that which: "(1) abuses a relation or position which gives

28

him power to damage the plaintiff's interest; (2) knows the plaintiff is susceptible to injuries through mental distress; or (3) acts intentionally or unreasonably with the recognition that the acts are likely to result in illness through mental distress." *C.B. v. Moreno Valley Unified Sch. Dist.*, 544 F. Supp. 3d. 973, 995 (C.D. Cal. 2021). The FAC is replete with well-plead allegations that USSS used its tremendous power to abuse and assert control over athletes.

Specifically, Plaintiffs are in a vulnerable position as "Foley abused his position of power in the snowboarding community to garner loyalty and trust while instilling fear and intimidation" and that, "Foley did so all while USSS and USOPC shielded him, disregarded allegations, and failed to protect the female athletes of their organizations." *Id.* ¶11. This abuse of power was extreme and outrageous. *C.B.*, 544 F. Supp. 3d. at 994–95 (finding that a school resource officer knew or should have known that a young student with disabilities was vulnerable to his excess power).

Contrary to USSS's contentions, Plaintiffs' IIED claims are rooted in far more than their blatant failures to act. To support its position, USSS relies on *Colonial Van & Storage, v. Superior Court*, 76 Cal. App. 5th 487, 506 (Cal. App. Ct. 2022), which held that an IIED claim for failure to act failed as a matter of law where defendant did not know nor reasonably should have known that third party actor was prone to violence. This case is distinguishable from Plaintiffs' claims. There, the court held that an employer did not intend to inflict emotional distress when employees were attacked by another employee's son with a handgun while in that employee's home. The employer had no knowledge of the son's mental health issues, access to weapons, or any other information that would have made his attack on the employees foreseeable. A coach sexually abusing and harassing athletes in an environment that condoned underage drinking, where middle-aged male coaches shared beds with young female athletes, where Foley decided who went to the Olympics, and did not maintain

appropriate boundaries between athletes and coaches is much more foreseeable than the situation in *Colonial. See id.* at 506–07.

USSS further points to *Brown*, where the court dismissed IIED claims against USAT for not alleging USAT knowingly allowed the predatory coach to continue coaching after becoming aware of his abuse. *See* Mot. 52. However, *Brown* recognized that, "[t]o the extent USAT did not protect plaintiffs from [the coach] after learning [of abuse allegations], that could potentially support a claim against USAT for the [IIED]." *Brown*, 40 Cal. App. 5th at 1109. As noted, USSS was aware of Foley's perversions and misconduct for decades and, yet, allowed him to continue coaching and exercising near plenary power over athletes' careers. *See* §E.2.a, *supra*. Despite knowing Foley's perversions, USSS continued to actively arrange lodging for young athletes where they were forced to sleep in the same hotel bed as Foley. *See* FAC ¶60. USSS officials, like Nyberg, actively encouraged Callan—a minor athlete—to drink with Foley and other adult coaches. *See* FAC ¶133. Each act was *at least* acts taken "unreasonably with the recognition that the acts are likely to result in illness through mental distress." *See C.B.*, 544 F. Supp. 3d. at 994.

## CONCLUSION

For the foregoing reasons, Defendant USSS's Motion to Dismiss Plaintiffs' First Amended Complaint should be denied.

Dated: August 25, 2023        Respectfully submitted,

**BOIES SCHILLER FLEXNER LLP**

By: */s/ Alison L. Anderson*
Alison L. Anderson
*alanderson@bsfllp.com*
California Bar No. 275334
725 S Figueroa St, 31st Floor
Los Angeles, CA 90017
Telephone: (213) 995-5720
Facsimile: (213) 629-9022

Sigrid S. McCawley
*smccawley@bsfllp.com*
Florida Bar No. 129305

Alisha Moriceau
*amoriceau@bsfllp.com*
Florida Bar No. 1011395
401 E. Las Olas Blvd., Suite 1200
Fort Lauderdale, FL 33301
Telephone: (954) 356-0011
Facsimile: (954) 356-0022

Kenya K. Davis
*kdavis@bsfllp.com*
Washington DC Bar No. 502305
1401 New York Ave., NW
Washington, DC 20005
Telephone: (202) 237-2727
Facsimile: (202) 237-6131

Erica N. Sweeting
*esweeting@bsfllp.com*
New York Bar No. 5517768
55 Hudson Yards, 20th Floor
New York, NY 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

Mariah J. Noah
*mnoah@bsfllp.com*
California Bar No. 339658
44 Montgomery St, 41st Floor
San Francisco, CA 94104
Telephone: (415) 293-6800
Facsimile: (415) 293-6899

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Rosey Fletcher, Erin O'Malley, and Callan Chythlook-Sifsof, certifies that this brief contains 17,968 words and 54 pages, which complies with the word and page limit set by the Court's June 28, 2023 Order.

*/s/ Alison L. Anderson*
Alison L. Anderson